NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0484n.06

No. 15-4193

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

KATHERINA SWANK,

    Plaintiff-Appellant,

v.

CARESOURCE MANAGEMENT GROUP
CORPORATION,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE:    BOGGS, ROGERS, and STRANCH, Circuit Judges.

    ROGERS, Circuit Judge. Katherina Swank appeals the district court's entry of summary judgment in favor of her former employer, CareSource Management Group, Co., on her Americans with Disabilities Act and state-law discrimination claims. Swank is a registered nurse and has rheumatoid arthritis. In 2011, CareSource eliminated her existing position and offered her a new position as a RN Case Manager-High Risk ("CMHR"). The new CMHR position involved driving to conduct face-to-face visits with CareSource clients. Believing that Swank was unable to conduct these face-to-face visits due to her rheumatoid arthritis, CareSource terminated Swank.

    On appeal, Swank argues that the district court erred by holding that she had failed to establish a genuine issue of fact about whether she could perform the CMHR position without

accommodation. This argument is unavailing because the undisputed facts establish that Swank needed accommodation to perform the CMHR position.

Swank also argues that the district court erred in holding that there were no genuine issues of fact about whether (1) driving was an essential function of the CMHR position; (2) there were alternative positions to which Swank should have been reassigned; and (3) CareSource engaged in a good-faith interactive process with her. The undisputed facts establish that driving was an essential function of the CMHR position and that CareSource had no open alternative positions to which Swank could have been reassigned. Further, because Swank did not propose a reasonable accommodation to address her stated driving limitations, her interactive-process claim fails as a matter of law. These remaining arguments therefore do not provide a basis for relief.

## I.

CareSource is an organization that provides managed healthcare services to Medicaid recipients who are enrolled with CareSource (*i.e.*, CareSource members). Swank is a registered nurse ("RN") who lives in Kent, Ohio. In 2007, CareSource hired Swank to work as a case manager in its Warrensville Heights office. As a case manager, Swank worked with CareSource members and healthcare providers to conduct healthcare assessments of the members and to assist the members with a variety of health issues. At this time, Swank conducted her case manager duties entirely by telephone.

At some time between 2008 and 2009, Swank was diagnosed with rheumatoid arthritis. Due to her arthritis, Swank had intermittent difficulty walking, lifting heavy items, and driving. She also became more susceptible to illness due to a weakened immune system. In 2008, Swank

applied to work from home as a case management teleworker because she was having difficulty driving. In October 2009, CareSource began permitting Swank to work from home.

In 2011, CareSource began exploring a new approach to its delivery of managed care services to the Ohio Department of Job and Family Services ("ODJFS. CareSource had entered into an agreement with ODFJS to provide managed healthcare services to Medicaid recipients in Ohio. ODJFS mandated that CareSource change its healthcare plans so that CareSource could begin following a high-touch, community-based model. ODJFS also mandated that CareSource employees meet face-to-face with certain high risk members on at least a quarterly basis.

As a result of ODJFS's mandate, CareSource eliminated all case manager positions as they previously existed, and created a new position called RN Case Manager – High Risk. The CMHR was an RN who was the primary point of contact for CareSource members and was ultimately responsible for setting up the assessment of each member's care-treatment plan. CMHRs were supervised by team leaders and were assigned to teams that included social workers, patient navigators, and licensed practical nurses ("LPNs").

The CMHR was responsible for working with her team to set up face-to-face visits with members. A CMHR could delegate some of these face-to-face visits to social workers, patient navigators, and other CareSource employees on her team. However, when the visit involved a "duty that was within the scope of an RN license," the CMHR was required to conduct the face-to-face visit herself. The CMHR used her professional, clinical judgment to determine if a member needed to be visited by an RN.

In November 2011, CareSource employees Sheila Putman and Christi Goldshot told Swank that CareSource was going to offer her a CMHR position. Swank told Putman and Goldshot that she had concerns about traveling to conduct face-to-face visits with members due

to her driving and autoimmune issues. Swank testified that Putman and Goldshot suggested that Swank request leave under the Family and Medical Leave Act for the days that Swank could not drive to conduct a face-to-face visit with a member, and CareSource could assign someone else to conduct the visit. Swank also testified that Putman and Goldshot said that they would provide her with a protective mask to address her autoimmune-system issues.

On November 14, 2011, Swank sent a letter to Pamela Tropiano, CareSource's Senior Vice President of Health Services, stating that the CMHR position "would be hazardous considering [her] current health condition," Swank explained that since her "immune system [was] compromised . . . [s]ending [her] . . . into an environment where [she would be] in contact with highest risk patients would be detrimental to [her] health."

In December 2011, Goldshot and Putman met with Swank and showed her an offer letter for the CMHR position. Swank again expressed concerns about the driving portion of the position and "wanted to see if [CareSource] would assign [her] patients closer to [her] area." Swank testified that she told Goldshot and Putman that she "would be able to perform all the driving as long as [she] didn't have to drive as long a distance." In response to Swank's concerns about driving, Goldshot and Putman suggested that Swank make a formal request for accommodation. They also told Swank that CareSource would waive the driving requirements of the CMHR position while CareSource determined whether it could provide a reasonable accommodation for her.

The next day, Swank requested an application for an accommodation from Jane Casson, a Senior Benefits Analyst for CareSource. This application consisted of a copy of the CMHR job description and two questionnaires: one to be completed by Swank and one to be completed by her treating physician. In her questionnaire, Swank checked "yes" in response to CareSource's

question about whether she believed that she "need[ed] a reasonable accommodation in order to be able to perform the essential functions of [her] position." She also stated that she was "[u]nable to tolerate being exposed to changes in weather conditions" and "[u]nable to sit / stand for long periods of time." In response to CareSource's request to "describe the reasonable accommodation" that she was seeking, Swank stated that she "[o]riginally requested [an] open position on [November 3, 2011] that would enable [her] to stay gainfully employed. Meeting was with [m]anagement team and [she] made them aware of [her] concerns and hesitation to accept" the CMHR position.

In her questionnaire, Swank's physician, Nikita Hegde, stated that Swank would have "difficulty" performing some of the tasks and duties listed in the CMHR job description. Hegde also stated that during acute flare-ups of her rheumatoid arthritis, Swank's medical condition would preclude her from traveling to and from work and from being at work. Hegde stated that she was not aware of any accommodations that would address Swank's limitations.

Between late January and May of 2012, Swank had at least ten discussions with Casson about her request for a reasonable accommodation. Swank testified that she told Casson during these discussions that she would have "driven anywhere in [N]ortheast Ohio in connection with [the CMHR] job."

In February 2012, Swank learned that an onsite CMHR position at CareSource's Metro Broadway clinic was available. Swank asked her then-manager, Lynn Wertheim, if she should apply for this position. Wertheim questioned whether Swank would be able to drive to the Metro Broadway clinic every day and advised her to wait and see if her accommodation request was granted. Swank ultimately decided not to apply for this position.

Sometime in April 2012, Valerie Scarfpin, CareSource's Director of Human Resources, called Swank and outlined the essential functions of the CMHR position. Swank told Scarfpin that she could not perform the essential functions of the position with or without an accommodation. Scarfpin told Swank that CareSource had no other available position for which she was qualified and that CareSource was going to terminate her.

On May 21, 2012, Scarfpin called Swank again. Swank again answered "no" when Scarfpin asked her if she could perform the CMHR job duties and responsibilities with or without an accommodation. Scarfpin then told Swank that she had been terminated.

In 2013, Swank filed suit against CareSource in federal district court, alleging a claim of disability discrimination under the Americans with Disabilities Act, and related state-law claims.[1] CareSource moved for summary judgment on all of Swank's claims.

The district court granted CareSource's motion for summary judgment. 2015 WL 5853748, at *8. The district court reasoned that since the parties had argued their positions assuming that Swank was "disabled" for the purposes of the ADA, the court would also assume that Swank was disabled. *Id*. at *3. The district court then considered whether Swank could meet her burden of establishing that she was "otherwise qualified" for the CMHR position "without accommodation from [her] employer, with an alleged 'essential' job requirement eliminated, or with a proposed reasonable accommodation." *Id*. The district court concluded that the undisputed facts established that Swank could not perform as a CMHR without an accommodation. *Id*. at *3−4. The district court explained that in Swank's opposition to CareSource's motion for summary judgment, she had argued that she was "disabled but could have performed the job with an accommodation." *Id*. at *4. The district court also noted that

---

[1]Swank also alleged a claim for unlawful retaliation against CareSource, which the district court dismissed. *Swank v. CareSource Mgmt. Grp. Co.*, No. 1:13CV2048, 2015 WL 5853748, at *7−8 (N.D. Ohio. Sept., 30, 2015). Swank does not appeal the district court's dismissal of this claim. This claim is therefore not at issue in this appeal.

Swank had submitted a request for accommodation from CareSource in which she stated that she needed an accommodation in order to perform her job as a CMHR. *Id.* The district court concluded that Swank's argument that she could have performed as a CMHR without an accommodation was therefore "disingenuous and unsupported by the undisputed facts in [the] case." *Id.* at *3.

The district court also held that driving was an essential function of the CMHR position, and Swank could not establish that she was "otherwise qualified" for the CMHR position by showing that she could perform the position with that alleged "essential" job requirement eliminated. *Id.* at *4−5. In so holding, the district court explained that although the CMHR job description did not list driving as an essential function of the position, the description did state that driving was a physical requirement of the position. *Id.* at *4. The district court also noted that Swank understood that she would have to conduct some face-to-face visits with members and that CMHRs might have to be mobile up to fifty percent of the time. *Id.* at *4−5. In addition, "the very substance of Swank's argument [was] that she needed an accommodation because driving and mobility were required and 'essential' [functions of] the CMHR position." *Id.* at *5. The district court therefore concluded that there was no genuine issue of fact about whether driving was an essential function of the CMHR position. *Id.*

The district court also rejected Swank's argument that CareSource discriminated against her because it did not grant her accommodation request. *Id.* at *5−6. The district court held that since an employer is not required to assign other employers to perform the essential job functions of a disabled employee, CareSource was not required to assign other employees to assume Swank's driving duties. *Id.* at *5 (citing *Bratten v. SSI Servs., Inc.*, 185 F.3d 625 (6th Cir. 1999)). The district court also explained that a "plaintiff may not rely on accommodations that

he did not request." *Id*. (quoting *Manigan v. Sw. Ohio Reg'l Transit Auth.*, 385 F. App'x 472, 478 n.5 (6th Cir. 2010)). The district court concluded that because Swank did not ask to be assigned members closer to her home in her written request for accommodation, CareSource was not obligated to grant this request. *Id*. The district court also explained that even if CareSource was obligated to grant this request, Swank testified that this accommodation would not have addressed her concerns about long periods of car travel or exposure to changes in the weather. *Id*. at *5−6.

The district court held that CareSource also did not engage in disability discrimination when it failed to offer Swank an alternative position at other CareSource offices. *Id*. at *6. CareSource's "only other open telephonic positions were located at an office in Dayton." *Id*. The district court also noted that Swank did not argue that she was willing to relocate to Dayton or that she was able "to make the long [commute] between [her home in N]ortheast Ohio and Dayton." *Id*. The district court therefore concluded that there was not a genuine issue of material fact about whether CareSource discriminated against Swank when it failed to offer her an alternative position. *Id*.

The district court noted that in her brief in opposition to CareSource's motion for summary judgment, Swank raised an independent claim that CareSource had failed to engage in a good-faith interactive process. *Id*. at *8. However, because Swank had failed to allege this claim in her complaint, the district court declined to consider this claim. *Id*.

The district court similarly granted summary judgment in favor of CareSource on Swank's Ohio-law employment discrimination claims, explaining that "courts may generally apply federal precedent to employment-discrimination claims under Ohio law." *Id*. (citing *Jakubowski v. The Christ Hosp., Inc.*, 627 F. 3d. 195, 201 (6th Cir. 2010)).

II.

Swank failed to create a genuine issue of fact about whether she could perform as a CMHR without accommodation.[2]  In order to establish a prima facie case of disability discrimination in a direct-evidence case, a plaintiff must, in addition to establishing that he or she is disabled, establish that he or she is "'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (citation omitted).  The undisputed evidence established that, at least during acute flare-ups of her rheumatoid arthritis, Swank was unable to perform the CMHR position without accommodation.

The undisputed evidence established that at least during acute flare-ups of her rheumatoid arthritis, Swank could not perform the CMHR position without accommodation.  In response to CareSource's question about whether Swank's medical condition "preclude[d] travel to and from work," Doctor Hegde answered "Yes—acute flares / [causes] difficulty driving.  In response to CareSource's question about whether Swank's medical condition precluded her from being at work, Hegde answered "Yes, during acute flares."  Similarly, Swank testified that "[i]f [she] had a flareup [she] would not be able to go" to face-to-face visits with members.

Swank argues that there is "nothing in the record" that demonstrates that she had acute flare-ups.  This argument fails.  In response to CareSource's question about whether Swank was "likely to experience sudden or subtle incapacitation" due to her medical condition, Doctor Hegde answered "yes, with flare ups."  Hegde therefore indicated to CareSource that Swank was

---

[2]Although this was the lead argument in Swank's brief, Swank's counsel did not pursue the contention at oral argument.

likely to have acute flare-ups.  Similarly, Swank testified that "[w]ith rheumatoid arthritis you get flareups," and that changes in the weather "could make [her] flare up."

Swank also argues that her attendance record established that she could perform as a CMHR without accommodation.  This argument is unavailing.  It is true that Swank had no active requests for leave under the Family and Medical Leave Act and that she had only two absences in 2011  However, during the entire time that she was employed by CareSource, Swank was never required to conduct face-to-face visits with members.  Accordingly, Swank's attendance record did not establish that she was able to conduct face-to-face visits with members during acute flare-ups of her rheumatoid arthritis.

Swank further contends that the fact that she told CareSource employees that she was able to drive to visit members creates a genuine issue of fact about whether she could perform the CMHR position without accommodation.  This argument is also unavailing.  As stated above, Swank stated in her deposition that "[if] [she] had a flareup [she] would not be able to" drive to visit members.  "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citation omitted).  Similarly, Swank cannot create a genuine issue of fact by pointing to statements that she allegedly made to CareSource employees that contradict her own deposition testimony.

CareSource contends that because Swank claims that she was mistakenly regarded as disabled even though she could perform her job without accommodation, CareSource was not required to provide a reasonable accommodation to her, allow her to perform the CMHR position with the driving portions eliminated, or engage in a good-faith interactive process with her.  CareSource contends that we therefore do not need to consider Swank's remaining arguments

about whether (1) driving was an essential function of the CMHR job; (2) CareSource should have transferred Swank an alternative position; and (3) CareSource engaged in a good-faith interactive process. However, we assume that Swank had an actual disability and needed an accommodation to perform the CMHR job because (1) CareSource did not challenge the district court's assumption that Swank had an actual disability and (2) Swank's remaining arguments were premised upon the assumption that she had an actual disability.

Turning to the merits of Swank's remaining arguments, the district court properly determined that the undisputed facts established that driving was an essential function of the CMHR position. A plaintiff can establish the second element of his prima facie case by showing that he is "otherwise qualified" for the position "with an alleged 'essential' job requirement eliminated." *Kleiber*, 485 F.3d at 869. "A job function may be considered essential because: (1) the position exists to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; or (3) the function is highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Keith v. Cty. of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013) (citing 29 C.F.R. § 1630.2(n)(2)). "Factors to consider when determining whether a job function is essential to the position include: (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs." *Id.* at 925−26 (citing 29 C.F.R. § 1630.2(n)(3)). The undisputed facts established that traveling to conduct face-to-face visits with members was an essential function of the CMHR position.

First, the written job description for the CMHR position indicated that traveling to conduct face-to-face visits with members was a requirement of the CMHR position. Although CareSource did not list traveling under the "Essential Functions" heading of the CMHR written job description, it did include traveling under the "Work Environment/Physical Requirements" section of the job description. In this section, CareSource stated that the CMHR was required to "[p]erform reasonable travel related duties including member home visits, provider visits, and community based visits as needed to ensure administration of the program." By stating that a CMHR was required to conduct face-to-face visits with members, CareSource indicated that conducting these visits was an essential function of the position.

Second, CMHRs were hired for their abilities to conduct face-to-face visits with members who had complex health needs. Although a CMHR could delegate some face-to-face member visits to other employees on her team, the CMHR had to perform at least some of the face-to-face member visits herself. This was because the CMHR was an RN, while the patient navigators and social workers on her team were not RNs. Accordingly, when the visit involved a "duty that was within the scope of an RN license," the CMHR was required to conduct the face-to-face visit herself. If a member was having a health or behavior crisis, the CMHR was required to conduct face-to-face visits with the member. Because CareSource provided medical services to members who were identified to be at a high risk for health concerns, these members were likely to have complex medical or behavioral issues that an RN would have to address in person. CMHRs were thus hired for their abilities as RNs to conduct face-to-face visits with members who had complex health needs.

Third, there were a limited number of employees among whom the performance of conducting these face-to-face visits could be distributed. As stated above, although the CMHR

was an RN, the patient navigators and social workers on her team were not. In the event that a CMHR could not travel to visit a member who needed to be visited by an RN, the CMHR's team leader had to perform the visit. Accordingly, the district court correctly concluded that the undisputed evidence established that conducting face-to-face visits with members was an essential function of the CMHR position.

The district court also properly determined that CareSource did not unlawfully discriminate against Swank when it failed to offer her an alternative position in Cleveland or Dayton. "Although a 'reasonable accommodation' may include reassignment to a vacant position . . . an employer need not reassign a disabled employee to a position for which he is not qualified" or "displace existing employees from their positions . . . in order to accommodate a disabled individual." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) (citations omitted). All of the positions for RNs within the high-risk model were mobile. Similarly, all of the positions for RNs in Cleveland that were outside of the high-risk model— except for one or two positions in quality assurance—required travel to conduct face-to-face visits with members. Swank cites no evidence that any positions in a quality-assurance role became open during the time that she was seeking a reasonable accommodation. The undisputed evidence therefore established that CareSource had no available positions for RNs in Cleveland that would have addressed Swank's concerns about driving to conduct face-to-face visits with members.

CareSource was also not required to assign Swank to an alternative position in Dayton. It is true that CareSource had telephonic positions for RNs in its office in Dayton. However, Swank indicated to CareSource that she was not willing to relocate to Dayton.

Swank argues that she identified a number of positions in the Cleveland area that were filled after she requested a reasonable accommodation. This argument fails because these positions (1) were not available during the time that Swank was seeking a reasonable accommodation; (2) would not have addressed Swank's driving limitations; or (3) would have required CareSource to promote Swank.

First, several of the positions that Swank identified were not available during the time that Swank was seeking a reasonable accommodation. Swank contends that her manager Lynn Wertheim "was aware of other positions for RN's that were available in Cleveland" including positions for onsite CMHRs at the Metro Health Medical Center, the Parma Clinic, and "Metro with Dr. Petrulis." This assertion mischaracterizes Wertheim's testimony. Wertheim actually testified that nurses performed onsite CMHR positions at these medical facilities. Wertheim did not testify that these positions were open during the time that Swank was seeking a reasonable accommodation. Similarly, although Wertheim testified that she was aware of quality-assurance positions for RNs in Cleveland, she did not state that any of these positions was open during the time that Swank was seeking a reasonable accommodation. *Id*. at PageID #437. As stated above, an employer is not required to "displace existing employees from their positions . . . in order to accommodate a disabled individual." *Kleiber*, 485 F.3d at 869 (citation omitted). Accordingly, since none of these positions was vacant, CareSource was not obligated to assign Swank to them.

Second, two of the available positions that Swank identified for RNs in Cleveland would not have addressed Swank's driving limitations. Although a position as an onsite CMHR at the Metro Broadway Clinic became available in February 2012, this position would have required Swank to drive the "far distance" between her home and the Metro Broadway Clinic during her

-14-

daily commute and to drive to conduct face-to-face visits with members. Similarly, although a CareSource employee was selected to be the North Region Liaison for the Area Agencies on Aging in April 2012, Swank cites no evidence that indicates that this position was non-mobile. Further, as explained above, all of the positions for RNs in Cleveland—aside from one or two positions in quality assurance—required the RNs to conduct face-to-face visits with members. Accordingly, the North Region Liaison position also would not have addressed Swank's driving limitations.

Third, one of the positions that Swank identified for RNs in Cleveland would have required CareSource to promote Swank. Although CareSource promoted an employee to a team-lead position in February 2012, CareSource was not required to offer this promotion to Swank. This is because "[t]he ADA does not require an employer to offer an employee a promotion as a reasonable accommodation." *Hedrick*, 355 F.3d at 457 (citation omitted). Further, even if CareSource was required to promote Swank to a team-lead position, this position would not have addressed Swank's driving limitations. This is because team leads traveled to conduct face-to-face visits with members and to meet with providers in the community. Swank has therefore failed to establish a genuine issue of fact about whether CareSource should have offered her an alternative position.

Swank's interactive-process claim also fails as a matter of law. This is because Swank did not make a prima facie showing that she proposed a reasonable accommodation to CareSource. "The duty to engage in the interactive process with a disabled employee is mandatory and requires communication and good-faith exploration of possible accommodations. The purpose of this process is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Keith*, 703 F.3d at

929 (internal citations and quotation marks omitted). "Although mandatory, failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) (citations omitted).

Swank failed to propose a reasonable accommodation that would have addressed her stated driving limitations. Swank contends that she proposed a reasonable accommodation because she "sought to be assigned members in the geographic area of her home in order to limit driving [long] distances." However, Swank testified that even if she were assigned members closer to her home, she still might have to sit in the car for long periods of time due to traffic or bad weather and still might experience flare-ups due to changes in the weather. Swank therefore agreed that assigning her members closer to her home would not adequately address her concerns Accordingly, because Swank did not propose a reasonable accommodation to CareSosurce that would address her stated limitations, her interactive-process claim fails as a matter of law.

Swank contends that CareSource's failure to consider restructuring the marginal functions of the CMHR position or granting Swank leave on the days that she could not drive to visit members creates a genuine issue of fact about the adequacy of the interactive process. This argument is unavailing. It is true that Swank testified that Goldshot and Putman suggested that Swank put in a request for leave so that on the days that she could not drive to visit a member, CareSource could assign another CMHR to conduct the visit. However, Swank points to no evidence that indicates that she ever followed up on this suggestion by asking CareSource to grant her leave. Swank also does not cite any evidence showing that she ever asked CareSource to restructure the marginal functions of the CMHR position. Further, Swank did not ask CareSource to grant her leave or to restructure the marginal functions of her job in her written

request for an accommodation. Indeed, after submitting this request, Swank not only failed to indicate that either of these accommodations would adequately address her stated driving limitations, she told CareSource that she could not perform the CMHR position with or without accommodation. To prevail on an interactive-process claim, a plaintiff must meet his burden to "establish[] a prima facie showing that he proposed a reasonable accommodation." *Rorrer*, 743 F.3d at 1041 (citations omitted). "Part of this burden is that a plaintiff show that he requested the specific accommodation; a plaintiff may not rely on accommodations that he did not request." *Manigan*, 385 F. App'x at 478 n.5 (citations omitted). Because Swank did not ask CareSource to grant her leave or to restructure the marginal functions of the CMHR position, she cannot rely on these accommodations to support her interactive-process claim.

Swank also contends that CareSource's alleged failure to "engage in an appropriate individualized inquiry to determine if Swank's disability or other condition disqualified her from the CMHR position" demonstrates that CareSource may have violated the ADA by failing to engage in an interactive process with her. To support this contention, Swank claims that Goldshot obstructed the interactive process by determining that Swank was disabled before reviewing information that Swank's doctor had submitted to CareSource. This argument is unavailing. Although Goldshot formed an opinion that Swank could not perform the functions of the CMHR job prior to reviewing information from Swank's doctor, CareSource did not stop the interactive process after Goldshot formed this opinion. Rather, Goldshot suggested that Swank make a formal request for an accommodation. After Swank and Doctor Hegde returned the complete application to CareSource, Casson followed up with Hegde when clarification was needed and had at least ten discussions with Swank about her accommodation request. The undisputed evidence therefore established that CareSource, using information provided by both

Swank and her doctor, engaged in an individualized inquiry to determine if Swank could perform the CMHR position.

Swank also contends that CareSource did not engage in an interactive process with her because Casson and Goldshot failed "to recognize the actual discrepancies" between Swank's and Doctor Hegde's portions of the written accommodation request and because Casson concluded that Swank needed an accommodation to perform as a CMHR even though Swank had no active requests for leave and had only two absences in 2011. These arguments are without merit. As stated above, Swank and Hegde both indicated on the written accommodation request that, at least during acute flare-ups of her rheumatoid arthritis, Swank was unable to perform the CMHR job without accommodation. Their portions of Swank's written accommodation request were therefore consistent. Further, as stated above, Swank was never required to conduct face-to-face meetings with members while she was employed at CareSource. Her attendance record at CareSource therefore did not establish that, as a CMHR, she would be able to drive to conduct face-to-face visits with members. Accordingly, Swank's interactive-process claim fails as a matter of law.

In addition to raising an interactive-process claim in her complaint, Swank brought Ohio employment-discrimination claims against CareSource. The district court properly concluded that these claims failed as a matter of law. Given the similarity of the Ohio and federal statutes governing disability discrimination, "analysis of claims made pursuant to the Americans with Disabilities Act applies to" Ohio discrimination claims. *Jakubowski*, 627 F.3d at 201 (citation omitted). As explained above, the district court properly concluded that Swank's federal discrimination claims failed as a matter of law. Accordingly, the district court's dismissal of Swank's state-law claims was also proper.

The judgment of the district court is affirmed.