**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0433n.06

Case No. 19-4021

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

Jul 27, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BRENT RUSSCHER; JAMIE RUSSCHER, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| HOLLAND COMMUNITY HOSPITAL, | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| Plaintiff, | ) | OHIO |
| v. | ) | |
| | ) | |
| OUTDOOR UNDERWRITERS, INC.; | ) | |
| CERTAIN UNDERWRITERS AT | ) | |
| LLOYD'S, LONDON, subscribing to | ) | |
| policy 02HU11B0050; CERTAIN | ) | |
| UNDERWRITERS AT LLOYD'S, | ) | |
| LONDON, subscribing to policy | ) | |
| 02HU11B0068, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: CLAY, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge. During a hunting trip in 2012, Brent Russcher fell from a faulty ladder and broke his back. Mark Thompson, who operated the hunting grounds, admitted liability and the district court entered a $2.2 million judgment against him. Russcher then filed this suit, seeking to recover from Thompson's insurers. The district court concluded that the two policies at issue afforded Thompson and his business operations no coverage for Russcher's injuries and granted the insurers summary judgment. We AFFIRM.

**I.**

First, some hunting lingo. *Hunting outfitters* act as professional hunting guides; guests pay them to lead expeditions, make hunting grounds available, and supply provisions and lodging. *See Outfitter*, Oxford English Dictionary (3d ed., Dec. 2004). *Hunt clubs*, on the other hand, are private groups that lease land for members to hunt by themselves.

Thompson established one of each, both as unincorporated sole-proprietorships: Ohio Whitetail Adventures (an outfitting business) and the Mark & Tommy Hunt Club. He ran Ohio Whitetail Adventures as his full-time job for several years. But the outfitting business had little success, and Thompson lost money on the venture during the 2011–2012 season. As a result, Thompson testified, he planned to fold the outfitting business into the hunt club—though he conceded that he took no implementing steps.

Thompson formed the Mark & Tommy Hunt Club when he licensed the right to hunt on land owned by Scioto Land Company, which licensed only to hunt clubs, not commercial hunting operations (like outfitters). Accordingly, the hunting license between Scioto and the Mark & Tommy Hunt Club prohibited all club members from running commercial hunting operations on the Scioto property and from selling their right to hunt on the land without Scioto's approval. As a licensee of Scioto, Thompson's hunt club qualified for coverage under Scioto's liability insurance policy. Policy 68 (short for Lloyd's, of London, Policy No. 02HU11B0068) provided up to $1 million in coverage for liability arising from hunt club activities on the Scioto property.

Thompson also discussed leasing another tract of hunting land from a company called Earthtouch. Anticipating a deal, Thompson applied for and received a similar $1 million liability policy on the Earthtouch property under Policy 50 (Lloyd's, of London, Policy No. 02HU11B0050). The deal with Earthtouch fell through, however, after the county game warden

discovered Thompson's friends hunting on the land without permission and in possession of a doctored document from Earthtouch purporting to authorize their presence. Though Thompson never did lease the land, his insurance for hunt club activities on the Earthtouch property remained in effect under his policy.

Russcher enters the picture after finding Thompson's website for Ohio Whitetail Adventures (although Thompson thought the two may have first met at a trade show). He arranged with Thompson for a hunting trip on the Scioto property in early 2012. During the expedition, Russcher climbed to a platform secured to a tree (a "tree stand" among hunters). When he began climbing down, the ladder allegedly twisted inward, causing Russcher to fall twenty feet and break several vertebrae. Russcher and his wife sued Thompson and Ohio Whitetail Adventures, claiming that Thompson negligently failed to maintain, install, or inspect the ladder. Thompson admitted liability, and the district court entered an approximately $2.2 million judgment against him. Neither the pleadings nor the judgment in that case mentions the Mark & Tommy Hunt Club.

In 2017, the Russchers brought this action as judgment creditors, seeking insurance proceeds from Thompson's insurers, the two syndicates of underwriters who issued Policies 68 and 50 through the Lloyd's of London marketplace and the syndicates' United States agent, Outdoor Underwriters, Inc. The district court granted the insurers' motions for summary judgment, holding that neither policy provides coverage here. The court found that Russcher's injuries did not arise from hunt club activities, thus precluding coverage under Policy 68. And the court concluded that Policy 50 insured only the Earthtouch property, ruling out coverage for Russcher's injuries on the Scioto property. This appeal followed.

**II.**

We review de novo the district court's summary judgment grants, *Kalich v. AT&T Mobility, L.L.C.*, 679 F.3d 464, 469 (6th Cir. 2012), affirming if, viewing the record in the light most favorable to the nonmoving parties, there remain no genuine disputes of material fact and the moving parties are entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**A. Policy 68**

Policy 68 covers "occurrences arising out of the activities and operations of the hunt club and its members," meaning the Mark & Tommy Hunt Club's activities on the Scioto property. Concluding that Russcher dealt with Thompson's outfitting business and never joined (or even knew about) Thompson's hunt club, the district court held that Russcher's injuries did not arise from the hunt club's activities.

*Ambiguous policy language.* On appeal, Russcher argues that the district court erred in failing to view the term "hunt club" as ambiguous enough to encompass Russcher's interactions with Thompson. He contends that "a reasonable person could conclude that leasing and insuring land and allowing others to hunt on the land, with or without a fee, qualifies as a hunt club." Perhaps so, but Russcher's argument misses the point. Russcher must show that his injuries resulted from the activities of "*the* hunt club"—that is, the Mark & Tommy Hunt Club. The district court found that Thompson ran two distinct organizations, an outfitting business and a hunt club, and that the undisputed evidence showed Russcher's injuries arose from his dealings with the outfitting business. The court adopted no particular definition of hunt club in its decision. And Russcher fails to explain how taking a broader view of what defines a hunt club would establish that his injuries arose from the activities of the Mark & Tommy Hunt Club.

*Sole proprietorship.* Russcher also argues that because Thompson ran his two hunting organizations as sole proprietorships, insurance covering the hunt club business also benefited the outfitting business. True, under Ohio law, "[a] sole proprietorship has no legal identity separate from that of the individual who owns it." *Patterson v. V & M Auto Body*, 589 N.E.2d 1306, 1308 (Ohio 1992). Yet Policy 68 covered the Mark & Tommy Hunt Club, not Ohio Whitetail Adventures. Ohio courts do not view a policy insuring one sole-proprietorship as necessarily covering all of that individual's other solely owned businesses. *See Ind. Ins. Co. v. Hardgrove*, No. 99AP-1132, 2000 WL 633595, at *3–4 (Ohio Ct. App. May 18, 2000) (a liability insurance policy issued to a sole proprietorship sporting goods store did not cover an injury arising from the insured's solely owned residential landlord business, even though the insured ran the landlord business from the sporting goods store).

*Genuine dispute of material fact.* Russcher seeks no trial to resolve disputed facts; instead, he asks this court to reverse and correct the district court's alleged error of failing to enter summary judgment in his favor sua sponte. But certain segments of Russcher's brief seem to advert to factual disputes about whether his injuries arose from the Mark & Tommy Hunt Club's activities. Assuming Russcher argues that the district court improperly short-circuited the fact-finding process, he nonetheless fails to establish a genuine factual dispute to forestall summary judgment.

Discovery yielded the following undisputed facts: Russcher learned about Ohio Whitetail Adventures either through its website or at a trade show where Thompson promoted his services. When he arrived for his hunting trip, Russcher signed a release identifying Ohio Whitetail Adventures eight times and not mentioning Thompson's hunt club at all. He paid Thompson $1,300 for four days of hunting and lodging, guidance about where to hunt, and the use of tree stands that Thompson installed. Some of the other individuals who coordinated with Thompson

to hunt on the property did not pay the fee that Russcher did. Russcher and his friend slept in a dormitory with Thompson's other customers, in keeping with outfitting arrangements. Russcher confirmed that "a lot of guys"—fellow hunters—stayed in Thompson's barn that weekend. (Thompson identified only six members belonging to the Mark & Tommy Hunt Club.) Russcher had never heard of the Mark & Tommy Hunt Club before this litigation, he had no conversation with Thompson about joining a hunt club, and he did not view his dealings with Thompson as joining a hunt club. Russcher believed that if he wanted to hunt for more than four days, he would need to pay more. All this evidence supports the conclusion that Russcher paid for the right to hunt Thompson's leased land for a limited time, rather than join the Mark & Tommy Hunt Club.

In the background section of his brief, Russcher cites his deposition testimony that Thompson invited him and his hunting buddy to come back to the Scioto property and hunt again free of charge for the rest of the year. Yes, an invitation to return is consistent with joining a hunt club, but Russcher's isolated support for his stance does not itself generate a genuine issue of fact. After all, Thompson could have invited Russcher to return as a social guest or as an incentive to schedule future trips with Ohio Whitetail Adventures; the invitation alone does not establish that Thompson acted on behalf of the Mark & Tommy Hunt Club. No evidence suggests that Russcher knew about the hunt club, received information about the club's bylaws, that Thompson ever listed Russcher's name on the club's roster, or that Thompson informed Scioto and his insurers about a new member joining the club. At best, Russcher raises a "mere . . . scintilla of evidence," insufficient to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Russcher also contends that Thompson intended to merge his outfitting business with his hunt club by the time of Russcher's injury, so that even though Thompson used the name Ohio

Whitetail Adventures, Russcher actually transacted with the hunt club. But the undisputed evidence shows that Thompson continued to operate a distinct outfitting business: he maintained a website for the outfitting business, promoted his services at trade shows, and maintained a dormitory where customers slept. Even accepting as true Thompson's testimony that he told Russcher he "was switching everything over to [the Mark & Tommy Hunt Club]," Thompson admits that he took no concrete steps to merge the two operations. Thompson's unrealized intent creates no genuine factual dispute as to whether Russcher's injuries stem from hunt club activities.

The dissent views the record as sufficient to create a genuine issue of fact as to whether Russcher's injuries arose from hunt club activities. We may not consider, however, the evidence emerging from the dissent's self-directed inquiry into the record. Courts should not consider issues not raised in the appellant's brief, let alone "comb the record sua sponte in search of factual disputes." *Reed v. City of Memphis*, 735 F. App'x 192, 201 (6th Cir. 2018). "[T]he free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id.* (quoting *Guarino v. Brookfield Twp. Tr.*, 980 F.2d 399, 404–05 (6th Cir. 1992)). Besides, by delving sua sponte into the record, the dissent deprives the insurers of an opportunity to respond to the alleged factual disputes gleaned there.

**B. Policy 50**

Policy 50, like Policy 68, covers liability arising from hunt club activities. The district court held that Policy 50 affords no coverage for incidents on the Scioto property where Russcher sustained his injuries.

*"Coverage territory."* Russcher first argues that the district court construed Policy 50's geographic reach too narrowly. Recall that Thompson applied for coverage under Policy 50 while negotiating a lease on the Earthtouch property. Policy 50's certificate page addresses 400 acres in

McArthur, Ohio (the approximate size and location of the Earthtouch property) and lists Earthtouch as the property owner. Russcher's injury, however, took place on the 300-acre Scioto property in Hamden, Ohio.

Russcher tries to expand the reach of Policy 50 by seizing on the term "coverage territory."[1] Policy 50 covers "bodily injury . . . caused by an occurrence that takes place in the coverage territory." And the policy broadly defines "coverage territory" to comprise "[t]he United States of America (including its territories and possessions), Puerto Rico and Canada." But the policy also limits coverage to "property designated and on file with the company." Russcher views these terms—the broad "coverage territory" and the provision restricting coverage to designated properties—as creating an ambiguity about the geographic scope of coverage that the court should resolve in favor of covering all of Thompson's hunt club activities in the United States.

Courts review insurance policy terms in the context of the whole policy so as to read the terms in harmony. *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997); *see also Stith v. Milwaukee Guardian Ins., Inc.*, 541 N.E.2d 1071, 1072 (Ohio Ct. App. 1988) (explaining that "such construction must be given as will harmonize and give effect to all [the policy's] provisions, and that no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible"). Policy 50 functions as a large group policy to which hunt clubs can apply and buy insurance for leased premises. The definition of "coverage territory" limits the potential location of those leased premises to ones within the United States and Canada. If Thompson leased a hunting preserve in Mexico, for example, Policy 50 would not cover activities on that property

---

[1] In fact, Russcher uses the term "coverage area." But that term does not appear in Policy 50 or anywhere else in the record. Russcher apparently means "coverage territory," a term appearing throughout the policy.

even had he designated the site. Defining the group policy's maximum geographic reach does not conflict with requiring insureds to specify the properties to be insured.

*Exclusion.* Under Ohio law, courts presume that insurance coverage applies broadly unless the policy clearly carves out an exclusion. *Moorman v. Prudential Ins. Co. of Am.*, 445 N.E.2d 1122, 1124 (Ohio 1983) (per curiam). "[A]n exclusion from liability must be clear and exact in order to be given effect." *Lane v. Grange Mut. Cos.*, 543 N.E.2d 488, 490 (Ohio 1989). Russcher argues that the designated-property provision acts as an exclusion that lacks sufficient clarity. Even assuming the provision acts as an exclusion, its meaning is unambiguous: the policy limits coverage to properties designated and on file with the insurer—here the 400 acres owned by Earthtouch in McArthur, Ohio.

*Designation.* Russcher also contends that Thompson *did* designate and put on file the Scioto property with his insurer. But Russcher forfeited this argument by failing to raise it before the district court. *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014).

**III.**

We AFFIRM.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part**.

I concur in the majority's discussion and disposition of Russcher's claim under Policy 50. However, because the record contains sufficient evidence, viewed in the light most favorable to Russcher, to conclude that Policy 68 provides coverage, I dissent in part.

## I. Background

Hunt clubs involve "hunters . . . grouping together . . . to lease hunting rights on private land." R. 52-2, PID 1692. According to Thompson, "[e]very hunt club charges their members." R. 45-1, PID 917. In contrast to the operation of a hunt club, Thompson testified that as an outfitter he spent "[a] lot of one-on-one time" with hunters and "babied them more," including cooking for them. *Id.* at 846-47. Similarly, Russcher testified that "the outfitter will really cater to you. They bring you to the stand. Personally from the stand usually they have a guide sit with you the whole time, cook all your meals. If you get a deer they process it for you and take care of it for you." R. 43, PID 384.

### A. Policy 68 and the Scioto Property

Thompson started two unincorporated sole-proprietorships—Ohio Whitetail Adventures (OWA) and the Mark & Tommy Hunt Club (MTHC). Thompson registered the tradename OWA with the Ohio Secretary of State in 2009. As Thompson began to lose money on OWA, he planned to fold it into MTHC. Thompson first used the MTHC name when he executed a license to hunt on land owned by the Scioto Land Company (Scioto):

Q. Okay. And when you leased this land on October 1, 2011, you leased it in the name of Mark and Tommy Hunt Club?

A. Yes.

Q. Now, who's—you're Mark?

A. Yes.

Q. Who is Tommy?

A. An old friend I went to school with. That woman said, "Well, you've got to make a hunting club name up," so this was three or four years prior to this—

Q. Okay.

A. And I said okay, "Mark and Tommy," because he was an old friend of mine.

R. 45-1, PID 813-14. Thompson testified that he did not have an account, books or records for MTHC. Thompson also testified that he never filed articles of organization with the Secretary of State or held any formal meetings of MTHC. In January of 2012, he "was rolling Ohio Whitetail Adventures all over to a hunt club" and he was "going to put book and hunt through Ohio Whitetail and just keep it as Ohio Whitetail Adventures Hunt Club." *Id.* at 883.

Under the hunting license between Scioto and MTHC, the hunt club qualified for coverage under Scioto's liability insurance policy. The license stated: **"**At all times during the term of this License, Licensor, at the cost and expense of Licensees, shall maintain a liability insurance policy specifically applicable to the Premises insuring Licensor and Licensees as their respective interest may appear." R. 44-1, PID 653. "It is undisputed that the Scioto Property leased by Mark & Tommy Hunt Club was where the accident occurred and was 'acreage leased to the Hunt Club' covered by Policy 68." Appellees' Br. at 28. Policy 68 was amended to include "Scioto Land Company – and Mid-Continental Timberland Fund . . . As Licensor and Hunting Clubs as Licensee." R. 45-3, PID 1191. The policy also contained the following description:

> DESCRIPTION OF COVERAGE:
>
> It is hereby agreed and understood that this insurance applies only to occurrences arising out of the activities and operations of the hunt club and its members, guests, agents or employees on acreage leased to the Hunt Club by RMK Timberland Group.

*Id.* at 1236.[1] The policy further described this coverage:

---

[1] "The insured landowners are collectively referred to throughout Policy 68 as 'RMK Timberland Group.'" Appellees' Br. at 27.

WHO IS AN INSURED (Section II) is amended to include:

1.) The "Hunt Club"

2.) "Hunt Club Members" and their guests

3.) Invitees, agents or employees of the "Hunt Club"

But only with the respect to their liability arising from activities & operations of the "Hunt Club" within the acreage leased to the "Hunt Club".

The term "Hunt Club" shall mean that organization or association leasing land from, but only for its activities or operations within the leased land.

The term "Hunt Club Member" shall mean a person on the active member roster listing of the "Hunt Club" on the date the "Bodily Injury" or "Property Damage" allegedly occurred.

*Id.* at 1243.

### B. Russcher's Hunting Trip

After reviewing the OWA website or meeting Thompson at a trade show, Russcher contacted Thompson and arranged to hunt on the Scioto property along with a friend, Shane Burch. Regarding the services he would receive from Thompson, Russcher testified that he "was looking for a place to hunt" and he "wasn't sure what [he] was getting when [he] called [Thompson] up." R. 43, PID 385-86. Russcher "didn't know if [he] was joining a hunt club, didn't know if [he] was going to an outfitter, didn't know." *Id.* at 405. Further, Russcher didn't "know if [Thompson] ever said he was an outfitter." *Id.* at 409. Russcher testified that Thompson did not agree to help process meat but did offer a place to sleep. Prior to the incident resulting in his injury, Russcher had never heard of MTHC. However, Russcher also testified:

> I don't know if it was before or after I fell, I think it was Shane that told me that we could go back, but obviously I didn't. He told me that now that we paid that we could go back for like the calendar year or whatever I guess. Shane went back . . . for free.

*Id.* at 390.

Thompson testified that he met Russcher at a trade show in Grand Rapids. At the trade show, Thompson had literature for OWA and "a map and everything of Mark & Tommy Hunt Club" in addition to an MTHC contract. R. 45-1, PID 920-21. Thompson had a separate agreement for MTHC but was using the OWA agreement because he was planning on using the OWA name and adding "Hunt Club to it later." *Id.*

Thompson quoted Russcher and Burch, $1,600 to hunt on the Scioto property and stay in a "pole barn." *Id.* at 844. Thompson recalled putting the payment in a jar and believed it went to the following year's lease. When Russcher and Burch arrived on January 6, 2012, Thompson had them sign a waiver and release agreement, which named OWA but did not mention MTHC. Thompson stated that he thought the MTHC "name sounded ridiculous" but that in hindsight he "should have added the name." *Id.* at 853-54. Thompson testified that he told Burch that he "was rolling everything over to a hunt club, so when they booked, they could come and go, basically, as they please." *Id.* at 841. Thompson further testified that he informed both Russcher and Burch that he "was switching everything over . . . to a hunt club, and they was more than welcome to come back that year" but never mentioned the MTHC name to Russcher because he "didn't have time." *Id.* at 851-52, 916. Thompson believed that Russcher was a guest of MTHC. Russcher did not remember seeing any signs indicating either OWA or MTHC on the property.

According to Thompson, Russcher and Burch stayed the night on the property and then someone, possibly Thompson himself, showed them a hunting location on the morning of January 7th. Russcher testified that Thompson did not provide any meals and recalled eating at a fast-food restaurant. Thompson testified that Russcher and Burch "kind of had to do their own thing" as he did not provide much guidance. *Id.* at 845. On January 9th, Russcher hunted from a tree stand:

> Q. And this tree stand that you were in at the time that this incident happened, did someone take you to that tree stand?
>
> A. Uh-uh, no.
>
> Q. How did you get to that tree stand?
>
> A. Mark Thompson kind of gave you directions on how to get there.

R. 43, PID 409. According to Russcher, as he was climbing down from the tree stand, the ladder twisted, causing him to fall and injure his spine.

On October 8, 2013, an insurance investigator named Sidney Bell met with Thompson. Regarding Russcher's hunting trip, Thompson told Bell:

> And that season there and I told him you know he wanted to come in in January. I said the only thing I got left it'd be the hunting club. I said you can, and it's a whole year membership. You can kind of come and go as you please. He said well I just want to come and hunt and 4 days. I said I can let you come and hunt the four days, but it's still going to cost you the same because everybody pays the same amount.

R. 44-1, PID 623.

Thompson could not recall when he first spoke with an insurance company about the incident, but that it was after he spoke to Russcher's lawyer in June of 2012 and roughly a month prior to his meeting with Bell. However, Thompson recalled first calling and leaving a message about the incident "a couple months" after it occurred. R. 45-1, PID 908-09.

## II. Analysis

We review the grant of summary judgment de novo. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007). "[W]e must view all evidence in the light most favorable to the nonmoving party." *Id.* Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Policy 68 covers "occurrences arising out of the activities and operations of the hunt club and its members, guests, agents or employees on acreage leased to the Hunt Club by RMK Timberland Group." R. 45-3, PID 1236. In his response to the insurer's summary judgment motion, Russcher argued that he "was injured on property covered by the policies, during the policy terms, and while hunting with the club described in the policy" and that "Thompson's hunt club was not a 'commercial hunting operation.'" R. 52, PID 1655. He further argued:

> [I]t does not matter whether Thompson called his business Ohio Whitetail Adventures or Mark and Tommy Hunt Club, or Thompson's Hunt Club. . . . What does matter is whether Thompson ran the business as a hunt club. Thompson states that for the 2012 hunting season, he ran the business as a hunt club. And the facts show that the business was run as a hunt club.

*Id.* at 1669. And in his brief to this court, Russcher argues the incident was covered because "a reasonable person could conclude that leasing and insuring land and allowing others to hunt on the land, with or without a fee, qualifies as a hunt club." Appellant Br. at 31.

The district court found that Russcher interacted with OWA only and "the record was insufficient to create a genuine issue of material fact with regards to whom Burch and Russcher transacted with." R. 59, PID 1832. However, the district court failed to consider the evidence in the light most favorable to Russcher.

The record is sufficient to create a genuine dispute of material fact whether Russcher's injuries arose from Thompson's hunt club. The majority asserts that "[n]o evidence suggests that Russcher knew about the hunt club." Maj. Op. at 6. However, Thompson testified that he met Russcher at a trade show where he had a copy of an MTHC contract and "a map and everything of Mark & Tommy Hunt Club." R. 45-1, PID 921. Thompson further testified that he informed both Russcher and Burch that he "was switching everything over . . . to a hunt club, and they was more than welcome to come back that year." *Id.* at 851. Similarly, in his interview with Bell,

Thompson stated he told Russcher that the payment was for a year-long membership. Russcher

paid $1,300 and knew that he would be able to hunt on the land, have access to lodging, and get a

basic orientation to the property, but he "wasn't sure what [he] was getting" and "didn't know if

[he] was joining a hunt club, didn't know if [he] was going to an outfitter."[2] R. 43. PID 405.

---

[2] Thompson testified the original quote was $1,600 but he only charged $1,300 in the end. The majority asserts, "Some of the other individuals who coordinated with Thompson to hunt on the property did not pay the fee that Russcher did." Maj. Op. at 5–6. The majority infers, in favor of the moving party, that other hunters did not pay the same fee as Russcher, and then infers that Russcher "paid for the right to hunt Thompson's leased land for a limited time, rather than join the Mark & Tommy Hunt Club." *Id.* at 6. But the record does not show that the individuals who did not pay were members of MTHC or even that they were on the property to hunt:

> Q. Who else was staying in your lodging?
> A. There was ten or 11 guys, friends and some was family.
> Q. Did all of these people pay the $1,600?
> A. Absolutely not.
> Q. Did any of them pay the $1,600?
> A. Yes.
> Q. How many of them?
> A. Probably three or four.
> Q. Were any of them listed on the lease with F&W and Scioto Land Company as members of the Mark & Tommy Hunt Club?
> A. No.
> . . .
> Q. Were any of the other people that were staying in your lodging—
> A. Yeah.
> Q. Hunting on the Scioto Land Company property?
> A. Yes.
> Q. How many of them?
> A. There was one other.
> Q. Who was that?
> A. Kenny Mathias.
> . . .
> Q. And did Kenny pay you $1,300 or $1,600?
> A. No.
> Q. What did he pay you?
> A. He paid me—he was already paid some, and I owed him a favor, so it was kind of one of them deals.
> Q. But he paid you some money?
> A. Yeah.

R. 45-1, PID 854-56. And Russcher only assumed others were there to hunt and did not know if they paid:

Although Russcher signed a release that identified OWA and stated he originally thought he would need to pay more if he wanted to hunt for more than four days, he also stated he belonged to Thompson's hunt club and could return to hunt on the land without additional fees. His friend, Burch, did go back without additional fees. This is consistent with the operation of a hunt club, in which members pay for their common use of land. And although it is true that Russcher had never heard the MTHC name prior to his accident, there is no indication in Thompson's hunting license with Scioto or Policy 68 that hunt club members were required to know the name of the club as it appeared in the documents.

Further, in his application for Policy 50, Thompson identified the name of his *hunt club* as "Ohio Whitetail Adventures,"[3] R. 1-2, PID 24, and testified that he was using the OWA agreement because he was planning on using the OWA name and adding "Hunt Club to it later," R. 45-1, PID 921. And Thompson testified that he used the OWA name because he thought the MTHC "name sounded ridiculous." *Id.* at 853. It is therefore reasonable to infer that Russcher had not heard the MTHC name not because he was actually receiving outfitter services, but because Thompson regretted the original name or simply preferred OWA. And again, Thompson had no obligation to use any particular name.

The majority asserts that "the undisputed evidence shows that Thompson continued to operate a distinct outfitting business," and points to (1) Thompson's website, (2) his trade show

---

Q. And you assume those other men were there to hunt as well?
A. Yeah.
Q. And they were also paying for the right to hunt?
A. I don't think all of them paid, I don't remember. I think some of them had paid the year before or something, I don't remember.

R. 43., PID 391. Therefore, the majority's inferences in favor of the moving party have no basis in the record.

[3] Because of this fact, in addition to Thompson's communications to Russcher and Burch that they paid for a year-long membership and the fact that Burch did return, the majority's characterization of Thompson's plan to roll all of his hunting operations into his hunt club as "unrealized intent" is unfounded. Maj. Op. at 7.

promotion, and (3) the pole barn on the property.[4]  Maj. Op. at 7.  None of these considerations resolves the dispute.  First, the record does not reveal when the website was operational.  But even taking the majority's inference in favor of the moving party—that the website was operational at the relevant time—it is disputed that Russcher learned about Thompson through that website.  Thompson testified, "No; I don't think it was my website [Russcher] got in touch with me with. . . . I kept thinking I run into him at a hunting show. . . . At Grand Rapids.  That's how I think he found out."  R. 45-1, PID 918.  And Russcher's recollection does little to support the majority's inference that he was dealing with an outfitter:

> Q. You thought you were dealing with a businessman who had a business in the outfitting world?
> A. I don't know if he ever said he was an outfitter, but—
> Q. Didn't his website say that?
> A. I don't remember what his website said, I'm sorry.  I know it said Ohio Whitetail, but I don't know.

R. 43, PID 408-09.  Second, as noted, Thompson testified that he had MTHC materials at the Grand Rapids trade show where he met Russcher.  Third, although providing lodging would be consistent with outfitting services, the pole barn does not controvert Russcher's argument.  Afterall, hunt club members pay for the common use of a property and its related amenities.  Further, Thompson did not offer to cook meals for Russcher, take him to hunting locations, stay with him during hunts, process deer meat, or provide any other one-on-one service associated with an outfitter.[5]  Russcher and Burch "kind of had to do their own thing."  R. 45-1, PID 845.

---

[4] Even if the majority's inference in favor of the moving party—"that Thompson continued to operate a distinct outfitting business"—is correct, to conclude that Russcher transacted with that separate business requires further inferences in favor of the moving party.  Maj. Op. at 7.

[5] Although Thompson purchased hunting stands, he did not purchase the tree stand at issue here:

Therefore, the record supports the inference that Russcher paid for a hunt-club membership not outfitting services.[6]

The majority asserts that "[n]o evidence suggests that Russcher . . . received information about the club's bylaws, that Thompson ever listed Russcher's name on the club's roster, or that Thompson informed Scioto and his insurers about a new member joining the club." Maj. Op. at 6. But as Thompson's testimony shows, the hunt-club operation was informal:

> Q. Okay. And you didn't have any books or records that you kept for Whitetail Adventures as a hunt club? In other words, like a roster or bylaws or anything like that?
>
> A. Yeah; I had bylaws up on the wall.
>
> Q. Well, you had some rules on the wall?
>
> A. Yeah.

---

Q. The stands that you were using in January of 2012, when Brent Russcher was there hunting, those were stands that you had bought with your money from Ohio Whitetail Adventures' business and installed on this property?

A. No.

Q. What stands were they?

A. They were big game stands that I got off a buddy of mine, Enzo Charqual [sic], or something like that.

. . .

Q. Did you buy them from him?

A. No.

Q. He gave them to you?

A. Yeah.

. . .

Q. Why did he give you those stands?

A. Because he had way too many.

Q. Where did he get them at?

A. He bought them new at Target in Lancaster. They had a good sale on them, so bought a crap load of them, and he owed me a few favors.

R. 45-1, PID 859-60.

[6] The majority avoids this conclusion by asserting that the court "should not consider issues not raised in the appellant's brief." Maj. Op. at 7. However, Russcher makes the core argument that Thompson's operation "qualifies as a hunt club" and cites to the most relevant evidence. Appellant Br. at 31. This is not a case in which the party has failed to raise an issue below or on appeal. And it is well-established that on a motion for summary judgment, we must consider "the record taken as a whole." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus, the majority's decision to cabin its consideration of the record is flawed.

Q. But you never filed any articles of organization, for example, with the Secretary of State?

A. No. No. No.

Q. You never had any—you never had any formal meetings where you had rules for how you were going to run the club and who was going to be in charge and that sort of thing? You ran the thing yourself, just like you did Ohio Whitetail Adventures?

A. Yeah, basically.

R. 45-1, PID 857-58. Therefore, there was little for Thompson to communicate to Russcher other than what he did communicate—the ability to return and use the property throughout the year.

The district court concluded that even if Russcher was a member of the hunt club, Russcher's accident would still not be covered:

> [E]ven if the Court were to accept as true that OWA and MTHC were indistinguishable from one another and OWA was an insured under Policy 68, MTHC and/or OWA forfeited their rights under Policy 68 by operating as a commercial enterprise. Policy 68 explicitly limits coverage to "to occurrences arising out of the activities and operations of the hunt club . . . ." The Hunting License, which controlled the rights and obligations of the parties subject to the Scioto Land Company lease, also prohibited commercial hunting activity on the property.

R. 59, PID 1832-33. However, the point is not that Thompson's outfitting and hunt-club operations were indistinguishable, but that Russcher joined a hunt club, whatever the name Thompson used to describe it. And, again, there is a genuine dispute of material fact over whether Russcher's injury resulted from a commercial enterprise. The record supports the conclusion that Russcher paid for a hunt-club membership and, therefore, that his injuries arose out of hunt-club activities rather than separate commercial activity.[7] Further, the Scioto license prohibits "commercial hunting or fishing activities or operations by Licensees or their agents, servants, employees, members or guests" and states, "Licensees shall not sell directly or indirectly, any hunting or

---

[7] I also note that Russcher's injuries arose out of hunt-club operations in the sense that the installation of the tree stand from which he fell was a hunt-club activity.

- 20 -

fishing permit, or any other right or privilege hereunder or in the Premises, or assign any or all of the rights and privileges of Licensees granted hereunder without the prior consent of Licensor." R. 1-1, PID 14. It also states, "Any violation of the provisions of the License by Licensees or their agents, servants, employees, members or guests shall at the option of Licensor, terminate this License." *Id.* at 16. Thompson testified that he did have Scioto's consent to add members to the hunt club. And although the parties could dispute whether Thompson's transaction with Russcher violated the hunting license, there is no indication in the record that Scioto exercised its option to terminate the license. Therefore, the provision of the license extending insurance coverage remained in effect at the time of Russcher's injury.[8]

---

[8] Policy 68 does state that the "Hunt Club" and "'Hunt Club Members' and their guests" are insured. R. 45-3, PID 1243. It then states that "'Hunt Club Member' shall mean a person on the active member roster listing of the 'Hunt Club.'" *Id.* There is no indication in the record of any "roster" for the hunt club. The Scioto license does state that "those individuals whose names appear on the signature page hereof . . . for purposes of this License will be known as Mark & Tommy Hunt Club" and Russcher's name does not appear on that list. R. 1-1, PID 13, 18. Regarding that list, Thompson testified:

> Q. Did you fill those names out?
> A. Yeah.
> Q. Is that your handwriting on—
> A. On all of them.
> . . .
> Q. Right. And the only people that were allowed to hunt on that land with this license was Mark and Tommy Hunt Club?
> A. Whoever is in that Mark and Tommy Hunt Club.
> Q. And the people who are in that Mark and Tommy Hunt Club are listed as licensees on Page CJW206, right?
> A. Yes, but we can add to it.
> Q. But you had to give them prior notice when you added to it, right?
> A. No.
> Q. Okay.
> A. They never told me that in the office. They said basically it's your hunting lease, and you can invite whoever you want on the property, as long they have some kind of a permission slip.

R. 45-1, PID 813-17. Therefore, contrary to the majority's conclusion, Russcher's absence from the list of names on the hunting license simply adds to the dispute of fact over whether he was on the property as part of the hunt club.

**III. Conclusion**

As the district court noted, "the ultimate question of coverage under Policy 68 boils down to whether Russcher's injuries arose 'out of the activities and operations of the hunt club and its members, guests, invitees, agents or employees[.]'"  R. 59, PID 1831.  The record contains sufficient evidence to create a genuine dispute of material fact over this question.  I would therefore reverse the grant of summary judgment as to Russcher's claim under Policy 68 and remand for further proceedings.