*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0155p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHAEL E. KLEIBER,

　　　　　　*Plaintiff-Appellant,*

*v.*

HONDA OF AMERICA MFG., INC.,

　　　　　　*Defendant-Appellee.*

No. 06-3490

>

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00109—James L. Graham, District Judge.

Argued: January 22, 2007

Decided and Filed: May 3, 2007

Before: SILER, MOORE, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Gary A. Reeve, KENNEDY REEVE & KNOLL, Columbus, Ohio, for Appellant. Douglas R. Matthews, VORYS SATER SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee. **ON BRIEF:** Gary A. Reeve, KENNEDY REEVE & KNOLL, Columbus, Ohio, for Appellant. Douglas R. Matthews, VORYS SATER SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee.

---

**OPINION**

---

　　KAREN NELSON MOORE, Circuit Judge. This case stems from a tragic off-the-job accident that has diminished Michael E. Kleiber's capacity to work. Admirably, Kleiber attempted to return to work despite his injuries. Unfortunately, he was unsuccessful. He sued his former employer, Honda of America Manufacturing, Inc. ("Honda"), alleging that it violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and related state statutes by failing to accommodate his disabilities. Finding no evidence that Kleiber could now perform any job at Honda, the district court granted Honda's motion for summary judgment. We similarly find no evidence showing that Kleiber was capable of working at Honda, and accordingly must **AFFIRM** the district court's judgment.

1

## I. BACKGROUND

### A.  Factual Background

Michael Kleiber began working in Honda's Marysville, Ohio plant in June 1989.  In November 1999, he remained employed full-time at Honda as a Production Associate and was assigned to a repair position in the Assembly Department.  His position required him to read inspection cards describing necessary repairs, to determine the method for performing the repairs, to implement fine motor skills in executing the repairs, and to drive cars across the shop floor.

#### 1.  Kleiber's Injury and Treatment

On November 21, 1999, Kleiber fell from a fence while performing yard work at his parents' home and hit his head on a concrete surface.  The fall left him with serious head injuries.  Kleiber remained hospitalized until January 21, 2000. During his hospitalization, Kleiber was under the care of Dr. Jerry Mysiw, the Director of The Ohio State University's Head Injury Diagnostic Clinic.  After being discharged, Kleiber continued to see Dr. Mysiw every three to four months.

When first discharged, Kleiber was unable to live independently, and he required ongoing physical, occupational, and speech therapy to overcome difficulties with attention span, thinking, and coordination.  His physical therapy continued through August 2000, at which time Kleiber had progressed such that he was able to carry most items on level surfaces and had only some difficulties moving heavy objects up stairs.  Although he was no longer receiving physical therapy, Kleiber's occupational therapy sessions continued into 2001.  Notwithstanding his therapy, Kleiber failed two driving examinations in March and August 2000.

#### 2.  Kleiber's Attempts to Return to Work

##### a.  BVR Assistance

In late March 2000, Kleiber met with a counselor from the Ohio Bureau of Vocational Rehabilitation ("BVR"), a state agency whose mission is to provide service leading to employment for Ohioans with disabilities.  In April 2000, the BVR determined Kleiber was eligible for its services and soon assigned Rodney Brandel, the BVR's liaison with Honda, to Kleiber's case.

Brandel arranged for Kleiber to undergo a neuropsychological evaluation—intended to identify the cognitive limitations resulting from Kleiber's brain injury—with Dr. James Arnett on August 17, 2000.  Dr. Arnett's evaluation noted various limitations, including deficits in (1) attention and concentration, including memory; (2) problem-solving abilities; and (3) manual dexterity. Dr. Arnett concluded that the evaluation revealed "mild to moderate" impairment of brain function, and that the deficits "raise[d] questions about safety in the performance of high risk activities." Joint Appendix ("J.A.") at 20-21 (Report of Neuropsychological Evaluation at 5-6). He further noted that he could not predict whether Kleiber's attention and concentration deficits would be further compromised in a chaotic environment.

After receiving Dr. Arnett's evaluation, Brandel met with Dr. Arnett, Kleiber, and Kleiber's parents on September 12, 2000, to discuss the results and Kleiber's prospects for returning to Honda. Based upon Dr. Arnett's evaluation, Brandel did not expect Kleiber to be able to return immediately to his former position at Honda, nor did Brandel believe that anyone else at the meeting had such an expectation.

### b.  Communications with Honda

Brandel began communicating with Honda regarding Kleiber's limitations and his desire to return to work.  On October 10, 2000, Dr. Mysiw filled out a Honda document labeled a "Work Capacity Form."  On the form, Dr. Mysiw indicated Kleiber's restrictions were "cognitive—i.e., memory, attention," and that these issues "require[d] supervision and possibly a job coach."  J.A. at 316 (Work Capacity Form).  He also indicated that Kleiber could not work in an environment featuring "unrestricted heights," and stated that Kleiber's endurance was "likely poor."  *Id*.  Sometime after October 10, 2000, Brandel submitted the Work Capacity Form to Honda.

Notwithstanding Kleiber's limitations, Doug Bigler, Honda's placement leader for the Marysville plant, and Cathy Cronley, Honda's in-house registered nurse, began to identify certain positions that they thought Kleiber might be able to perform.  These positions included "the Right Rear Beam Tighten position in [the] Assembly [Department]," "the Front Bumper Install position in [the] Assembly [Department]," and processes in the Paint Department.  J.A. at 25-27 (Bigler Aff. ¶¶ 14-15, 19).  Ultimately, Honda determined that none of these positions were appropriate for Kleiber because they required walking on uneven surfaces, working under substantial time pressures, and employing fine manual dexterity.

During this process, the Honda representatives determined that they needed more precise information regarding Kleiber's limitations, so they scheduled a meeting with Brandel.  On October 27, 2000, Brandel and Joe Roop, Kleiber's job coach from the BVR, met with several Honda representatives to discuss Kleiber's prospects for returning to work.  According to Brandel, "[t]he idea was to have the [job] coach work with Honda staff to identify a suitable position to start."  J.A. at 111-12 (Brandel Dep. at 75:23-76:2).  Kleiber did not attend this meeting.  The Honda contingent included Bigler, Cronley, and Jean Jackson, a disability and case-management nurse.  At the meeting, Honda's representatives indicated that the Work Capacity Form did not provide enough information for them to identify job processes that Kleiber could perform.  Consequently, Honda's representatives requested more specific information and asked that Kleiber be evaluated by Dr. Robert Shadel at Health Partners, Inc.[1]

### c.  Further Evaluations

Kleiber visited Dr. Shadel on October 30, 2000, for a Fitness for Duty Examination.  In this examination, Kleiber's performance on a memory test revealed a "significant memory deficit."  J.A. at 28 (Shadel Aff. ¶ 3).  Dr. Shadel also reviewed Dr. Arnett's earlier neuropsychological evaluation of Kleiber and concluded that both evaluations were consistent and "that there was no reason to expect significant improvement in Mr. Kleiber's condition in the future."  *Id*. (¶ 4).  Consequently, Dr. Shadel concluded that Kleiber's limitations in gait, balance, upper-extremity coordination, cognitive processing, and memory would substantially inhibit Kleiber's returning to work.  He also expressed some reservations regarding Kleiber's ability to perform job functions involving lifting, carrying, and moving around in the factory environment.  Nonetheless, he ordered a Functional Capacity Evaluation from Health Partners's physical therapist Sanford Goldstein.

During the Functional Capacity Evaluation, Kleiber lost his balance while walking down a flight of stairs and tested "inadequate" for balance on level surfaces.  J.A. at 138-39 (Goldstein Dep. 30:8-9, 32:12-13).  Based upon his examination, Goldstein identified four underlying limitations: (1) safety issues resulting from decreased motor planning; (2) poor balance on level surfaces; (3) decreased grip strength; and (4) decreased finger dexterity.  Goldstein concluded that Kleiber

---

[1] Kleiber describes Health Partners as Honda's in-plant medical provider.  The record provides no clear support for this contention.  In any event, Health Partners's relationship to Honda is not material to our resolution of Kleiber's claims.

should not be assigned to jobs that require "balance on uneven surfaces," "fine motor and medium motor dexterity," or "rapid cyclical work." J.A. at 403 (Phys. Work Performance Evaluation Summary). However, when asked in deposition what constituted a "rapid pace," Goldstein was unable to answer. J.A. at 141 (Goldstein Dep. at 43:15-18).

After receiving Goldstein's Functional Capacity Evaluation, Dr. Shadel wrote a report regarding Kleiber, dated November 13, 2000. Dr. Shadel concluded that Kleiber (1) could not work independently; (2) needed to work where balance would not be at issue; (3) had to work in a position that allowed only light gripping and simple, slow hand movements due to his dexterity deficits; and (4) could not be placed in a job requiring multiple processes. Additionally, Shadel noted that any return to work would have to be gradual because Kleiber's endurance was likely poor and that it was impossible to predict how Kleiber would function in a busy and noisy environment.

### d. Kleiber's Discharge from Honda

Based upon Dr. Shadel's report and "a thorough review of [Honda]'s production work environment," Honda's placement committee determined that Kleiber's limitations precluded him from working as a Honda Production Associate. J.A. at 397 (Memo dated Nov. 16, 2000). Consequently, and consistently with its policy of releasing employees who have been unable to work for twelve consecutive months, Honda terminated Kleiber's employment effective November 22, 2000. Randy Moore, Honda's assistant manager for restriction placement, sent a letter to Brandel on November 30, 2000 indicating that Honda was unable to accommodate Kleiber, and that it consequently terminated him. Brandel responded on December 4 with a letter reiterating the BVR's willingness to continue working with Honda on Kleiber's behalf, and requesting documentation of Kleiber's Functional Capacity Evaluation and Fitness for Duty Examination, as well as specific information regarding the jobs for which Kleiber was considered.

## B. Procedural History

On July 16, 2001, Kleiber filed a discrimination charge against Honda with the EEOC, which issued a right-to-sue letter on November 19, 2003. Kleiber filed a complaint in the U.S. District Court for the Southern District of Ohio on February 10, 2004. Kleiber's complaint alleged that Honda discriminated against him on the basis of his disability, and asserted claims for (1) violation of the Americans with Disabilities Act by refusing to provide a reasonable accommodation, refusing to participate in the interactive process, and causing the breakdown of the interactive process; (2) violation of the Ohio Revised Code's prohibition of disability discrimination, OHIO REV. CODE § 4112.02; and (3) discharge in violation of public policy as prohibited by Ohio Revised Code § 4112.02.

In early October 2005, both Honda and Kleiber filed motions for summary judgment. Kleiber amended his complaint on November 17, 2005 but continued to pursue the same three claims. On February 27, 2006, the district court issued an order granting Honda's, and denying Kleiber's, motion for summary judgment and entered judgment in Honda's favor. The district court concluded that Kleiber could not show that he was qualified for any position at Honda, and therefore, he could not show that Honda either failed to offer him a reasonable accommodation for, or terminated him because of, his disability. Further, the district court concluded that because Honda's actions did not contravene Ohio's prohibition of disability discrimination, Kleiber could not show that his termination would jeopardize that policy; accordingly, the district court rejected his claim for violation of public policy. On March 16, 2006, Kleiber timely filed his notice of appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had federal-question jurisdiction over Kleiber's ADA claim, 28 U.S.C. § 1331, and supplemental jurisdiction over Kleiber's state-law claims, *Id.* § 1367(a). We have jurisdiction over his appeal from the district court's final judgment. *Id.* § 1291.

We review de novo a district court's order granting summary judgment, *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004), and will affirm a grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c). In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. ANALYSIS

On appeal, Kleiber offers two arguments. First, Kleiber argues that a genuine dispute of material fact exists as to whether there was an open position at Honda for which he was qualified. Second, he contends that Honda denied him a reasonable accommodation by failing to participate in good faith in the informal, interactive process required to identify a suitable reasonable accommodation. These arguments both address Honda's alleged failure to offer Kleiber a reasonable accommodation.

### A. ADA Claim

The ADA prohibits discrimination because of disability against "a qualified individual with a disability," 42 U.S.C. § 12112(a), and defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* § 12112(b)(5)(A). The Act further defines "reasonable accommodation" to include

(A)   making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B)   job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

Kleiber bases his discrimination claim upon Honda's failure to accommodate his disability. Honda acknowledges that it did not accommodate Kleiber's disability but argues that no reasonable accommodation was possible because Kleiber was not qualified for any position. As noted above, failing to make a reasonable accommodation falls within the ADA's definition of "discrimination." Accordingly, claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.[2] *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283 (7th Cir. 1996). This conclusion is consistent with the definition of direct evidence, for if the fact-finder accepts the employee's version of the facts, no

---

[2] This, of course, is not necessarily true of claims premised upon an adverse employment decision such as a failure to hire, failure to promote, or discharge.

inference is necessary to conclude that the employee has proven this form of discrimination. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (sex-discrimination case; defining direct evidence as "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions"); *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (race-discrimination case; noting that direct evidence does not require the fact-finder to draw any inferences to conclude that the defendant discriminated against the plaintiff). It is further consistent with our analysis in *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1182-84 (6th Cir. 1996), in which we noted that claims for failure-to-accommodate fall within the category of cases in which the employer relies on the employee's disability in its decision-making, and consequently are suitable for analysis under the direct-evidence framework. *See also Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 724-30 (6th Cir. 2000) (applying direct-evidence standard to claim for failure to accommodate).

When an ADA plaintiff premises his claim upon direct evidence, we jettison the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases (also called "circumstantial-evidence cases"), and we analyze the claim under the following framework:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir.), *cert. denied*, 543 U.S. 817 (2004). Honda does not contest that Kleiber is disabled. Instead, the parties' dispute centers on whether Honda could reasonably accommodate Kleiber's disability by transferring him to a different job—part (2)(c) of the above framework. Accordingly, to survive summary judgment, it is Kleiber's burden to submit evidence sufficient to create a genuine issue of material fact regarding whether he is qualified for a position with a proposed reasonable accommodation.

### 1. Failure to Transfer Kleiber to an Open Position for Which He Was Qualified

Here, the accommodation Kleiber sought was a transfer to a different position at Honda. As noted above, a "reasonable accommodation" under the ADA may include "reassignment to a *vacant* position." 42 U.S.C. § 12111(9)(B) (emphasis added). Consequently, "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000). However, this duty does not require employers "to create new jobs [or] displace existing employees from their positions . . . in order to accommodate a disabled individual." *Id.*

#### a. Vacancy

First, we must determine whether a genuine issue of material fact exists regarding whether Honda had a vacant position in October and November 2000. Honda maintains that no vacancy existed "because each job process must be filled at all times for the production line to operate." Appellee Br. at 10 n.6. In other words, Honda's position is that as long as the plant is operating, there are *ipso facto* no vacancies. This argument proves too much. If Honda is correct, when it seeks to hire new Production Associates, it hires them into positions that are not vacant. This cannot be.

Honda also notes that Kleiber has offered no evidence that Honda was seeking to hire any Production Associates in October and November 2000, and argues on this basis that Kleiber has failed to create a genuine issue of material fact regarding a vacancy. Absent any evidence that Honda continued to hire Production Associates, seek out applicants, or accept applications during the relevant time period, we cannot conclude that a reasonable jury could find that a vacancy existed.

### b. Kleiber's Qualification

Even if a vacancy did exist, however, Kleiber's ADA claims fail because the record evidence does not create a genuine issue of material fact regarding his qualification for any particular position. Generally, an ADA plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Hedrick*, 355 F.3d at 457 (internal quotation omitted). Where the requested accommodation is a job transfer, "employers have a duty to locate suitable positions for" employees with disabilities. *Burns*, 222 F.3d at 258. Nonetheless, to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position. *Id.* at 258-59. Honda, however, does not have any job descriptions for Production Associates, J.A. at 236 (Moore Dep. at 61), so it was not possible for Kleiber to identify a specific job.

Honda itself attempted to locate positions appropriate for Kleiber. For instance, Honda considered Kleiber for various positions within the Assembly Department, but concluded that his limitations rendered him unqualified for each of them. Kleiber does not contest these conclusions.

Kleiber argues that he could have performed the "exterior wipe-off" job process in the plant's Paint Department, and further suggests that having a "job coach" would be a reasonable accommodation for him in this position.[3] However, uncontroverted evidence reveals that this job process is "located in [an] area[] with uneven surfaces, including gratings and raised platforms." J.A. at 27 (Bigler Aff. ¶ 19). Kleiber's Functional Capacity Evaluation indicated that his difficulties with balance precluded him from working on uneven surfaces, and Dr. Shadel indicated that Kleiber could work only where balance was not an issue. Accordingly, Kleiber cannot establish a genuine issue of material fact as to his qualification for this job process.

Kleiber does not suggest any other job processes for which he may be qualified. He emphasizes that some of his medical personnel concluded that he was capable of general factory work or certain tasks generally associated with factory jobs. Nonetheless, he does not indicate whether this translates to an ability to perform the essential job functions of any position *at Honda*. Accordingly, on the record before us, no reasonable jury could conclude that Kleiber was qualified for a position at Honda.

### 2. Failure to Engage in the Interactive Process

Kleiber further argues that he is unable to identify a particular suitable position at Honda because Honda did not participate in good faith in the "interactive process." According to Kleiber, Honda stonewalled throughout this process and refused to give him the information necessary to identify an appropriate job.

---

[3] The ADA countenances such a request for an "accommodation within an accommodation." In *Burns*, we noted that, when an employee can no longer perform her job due to a disability, her employer has a duty to consider transferring her to a different position for which she is qualified. *Burns*, 222 F.3d at 257. An ADA plaintiff is qualified for a job when she, "*with or without* reasonable accommodation, can perform the essential functions of the" position. 42 U.S.C. § 12111(8) (emphasis added). Accordingly, it is permissible for an employee to request a transfer to another job (itself an accommodation) that she can perform with an (additional) accommodation. *See Burns*, 222 F.3d at 257 (quoting *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)).

The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002). Even though the interactive process is not described in the statute's text,[4] the interactive process is mandatory, and both parties have a duty to participate in good faith. *Id.* at 1116; *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999); *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633-34 (7th Cir. 1998); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). When a party obstructs the process or otherwise fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Bultemeyer*, 100 F.3d at 1285 (quoting *Beck*, 75 F.3d at 1135).

Kleiber argues that Honda failed to participate in the interactive process in good faith, which led to the premature breakdown of the interactive process before the parties identified a position at Honda for which he was qualified. Specifically, Kleiber faults Honda for not providing specific information regarding the different positions and job processes at the Marysville plant.

We note at the outset that the interactive process that took place here appears not to have been a model interactive process. For example, the record provides no evidence that Honda and Kleiber communicated directly to discuss Kleiber's limitations and Honda's opportunities for him. Instead, the parties conducted the process through Kleiber's BVR proxies. While, of course, there is nothing wrong with involving such representatives in the interactive process, the process is designed to encourage direct participation on behalf of both the employee and the employer. *E.g.*, *Barnett*, 228 F.3d at 1114-15 ("Both sides must communicate *directly* . . . ." (emphasis added)); *Phoenixville Sch. Dist.*, 184 F.3d at 317 (suggesting, inter alia, that employer "meet with the employee" and ask what specific accommodation she would like).

Nonetheless, Kleiber has offered no evidence that Honda is to blame for these shortcomings. The record contains no suggestion that Kleiber attempted to participate directly in the interactive process, and was rebuffed. Instead, from the record before us, it appears that Kleiber chose to conduct the interactive process through proxies, and Honda obliged. Further, the record evidence indicates that Honda participated in good faith. Brandel (Kleiber's BVR counselor) stated in deposition that he had no reason to believe that Honda was not attempting in good faith to accommodate Kleiber's disability. He further described the Honda personnel with whom he interacted as "very professional" and "very open to talking about things." J.A. at 119 (Brandel Dep. at 125:21-24). Additionally, two Honda representatives, Bigler and Crowley, visited Honda's production line to try to identify appropriate jobs for Kleiber. They considered several positions, but concluded that Kleiber's limited dexterity and inability to work on uneven surfaces precluded him from being able to perform them. These efforts undercut Kleiber's claim that Honda participated in bad faith. And insofar as Kleiber alleges that Honda refused to provide information, the record contains no evidence that Kleiber, Brandel, or Roop requested any information during the

---

[4] Congress did, however, endorse the interactive process in the ADA's legislative history. *Barnett*, 228 F.3d at 1111 (quoting S. REP. NO. 101-116, at 34 (1989)).

interactive process.[5]  We cannot conclude that failing to provide unrequested information is tantamount to bad faith.[6]

Because Kleiber has not offered any evidence of lack of good faith on Honda's part, we reject his argument that Honda failed to engage in the interactive process in good faith and thereby caused the process to break down.

## B.  State-Law Discrimination Claim

Because Ohio's disability-discrimination statute and the ADA employ the same analysis, *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004), *cert. denied*, 543 U.S. 1146 (2005), the foregoing analysis applies to Kleiber's discrimination claim under Ohio Revised Code § 4112.02, as well as his claim under the ADA.

## C.  State-Law Wrongful Termination Claim

Because Kleiber does not address his wrongful termination claim in his appellate brief, he has abandoned this claim.  *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005); *Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996).

## IV.  CONCLUSION

We recognize that this case arose from sad circumstances.  We further recognize that Kleiber is to be commended for his attempts to return to work.  Nonetheless, our admiration and sympathies for him cannot alter the law.  Because, as explained above, he has not submitted sufficient evidence for a reasonable fact-finder to conclude that Honda violated the ADA, we must **AFFIRM** the district court's judgment in Honda's favor.

---

[5] The record does indicate that after Honda discharged Kleiber, Brandel requested information regarding Kleiber's physical evaluations and the jobs into which Honda considered placing him.  However, there is no evidence that Honda did not comply with these requests.

[6] We note that some courts have concluded that a plaintiff-employee must show that a reasonable accommodation would have been possible if the employer is to be liable for conducting the interactive process in bad faith.  *See, e.g.*, *Barnett*, 228 F.3d at 1116.  Unpublished opinions of this court have followed suit.  *See Breitfelder v. Leis*, 151 F. App'x 379, 380, 386 (6th Cir. 2005) (unpublished); *Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004) (unpublished).  Whether such a showing is an element of a bad-faith participation claim is irrelevant to this case because Kleiber has not pointed to evidence of bad faith.  Accordingly, we do not reach this issue.