NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0155n.06

Case No. 20-4091

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| | ) | **FILED** |
| | ) | Apr 11, 2022 |
| DEARIE CHEATHAM, | ) | DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| POSTMASTER GENERAL OF THE UNITED | ) | DISTRICT OF OHIO |
| STATES, Louis DeJoy, | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

Before:  SUTTON, Chief Judge, McKEAGUE and WHITE, Circuit Judges.

McKEAGUE, J., delivered the opinion of the court in which SUTTON, C.J., joined, and WHITE, J., joined Parts II.B and II.C.  WHITE, J. (pp. 12–23), delivered a separate opinion concurring in part and dissenting in part.

McKEAGUE, Circuit Judge.  Plaintiff-Appellant Dearie Cheatham worked as a clerk at the Corryville Post Office for seventeen years.  After taking medical leave, she sought to return to work.  She provided the United States Postal Service (USPS) with restrictions from her doctor that prohibited her from standing or lifting more than ten pounds.  USPS engaged in a protracted and unsuccessful search for a suitable position.  After Cheatham submitted revised restrictions eighteen months later, USPS offered her a modified position, which she refused in favor of disability retirement.  She then brought this suit, claiming that USPS discriminated against her because of her race and disability and retaliated against her for taking a variety of protected actions.  The

district court granted summary judgment to USPS on all her claims. For the reasons set forth below, we AFFIRM.

I.

Dearie Cheatham, an African American woman, started work at the Corryville Post Office in Cincinnati, Ohio in 1995 as a window clerk. In the course of her employment, she injured her foot. In 2012, she took leave pursuant to the Family and Medical Leave Act ("FMLA") for a surgery. After recovering, she began working a new assignment at the Dayton Call Center that allowed her to stay off her feet.

By November 2015, she needed an additional surgery on her foot, and again requested FMLA leave. Her doctor approved her to return to work in February 2016, but with significant medical restrictions. Her restrictions placed her at a maximum of four hours of sit-down work daily, requiring her to wear a controlled ankle movement boot. The restrictions required her not to stand, push, or carry anything, and that she could "lift no more than 10 pounds when sitting only."

When cleared to return to work, Cheatham reached out to Cliff Logan, who was the district manager for Health and Resource Management at USPS. She asked for help getting workers' compensation benefits for her surgery and about returning to work. Cheatham had previously filed a grievance based on the distance from her home to the Dayton Call Center, and the resulting settlement prohibited USPS from returning her to work there. If she could not return to work, she told him that she would consider disability retirement.

Shortly thereafter, Logan emailed Cheatham's old Corryville manager Jim Price to see if he had work and to ask him to fill out paperwork related to the search. Because Cheatham hadn't gotten her surgery approved for worker's compensation at the outset, she was not yet eligible for

the type of reassignment her medical restrictions required. Nevertheless, Logan and his colleague, Evon Clark, a human resources specialist with the USPS, sent additional search requests to area managers in April to try to identify work.

By May 2016, Cheatham had applied for disability retirement and had begun receiving social security disability benefits. In June, Price confirmed that Corryville had no sedentary work for Cheatham. On July 20, 2016, as part of her disability retirement paperwork, USPS certified that it had performed a search for work but "[r]eassignment is not possible. There are no vacant positions at this agency, at the same grade or pay level and tenure within the same commuting area, for which the employee meets minimum qualifications standards." R. 36-16, PID 1348.

Cheatham remained on the rolls at Corryville while her disability retirement paperwork was processed, which can take between six and twelve months from certification to completion. In April 2017, Clark emailed Price asking if there were positions available for Cheatham, and if not, asking him to perform a search for positions for seated work. In June and July, Logan and Clark sent additional requests for available, compatible work. In response to one search request, Price emailed asking for help getting Cheatham off his rolls, so she wouldn't "count against his number," given that she had not reported to Corryville in several years. In his July request, Logan indicated that "possible work has been identified in the Cincinnati Plant," but that "we need to assure that a properly completed search has been conducted."

In August 2017, through counsel, Cheatham requested an accommodation meeting with the District Reasonable Accommodation Committee. On September 19, 2017, the committee met, and all parties determined that updated medical requirements were needed. Cheatham supplied updated restrictions from her doctor that allowed her to stand intermittently for up to two hours a

day and allowed her to work eight hours a day. Shortly thereafter, Logan initiated a search for work that fit the new restrictions.

On November 20, 2017, USPS offered Cheatham a modified position as a distribution clerk back at the Corryville Post Office, requiring her to be able to lift up to 10 pounds standing. On November 28, Cheatham rejected the position and notified USPS that she would be accepting disability retirement, for which she had been approved.

Earlier that fall, in September 2017, Price sent Cheatham a letter informing her that she was in danger of termination because she had been on leave-without-pay for a non-workplace injury since September 2016. Because of changes in Cheatham's workers compensation status, her leave had been coded variously as both generic leave without pay and workers' compensation leave without pay. However, in November 2017, Clark directed that Cheatham's leave be reentered as workers' compensation leave without pay, which counts towards her retirement benefits.

In May 2017, Cheatham had contacted the Equal Employment Opportunity office at USPS, alleging disability discrimination because she had not been returned to work. On September 2, 2017, she filed a formal complaint alleging USPS discriminated against her based on her age, race, disability, and gender. After an investigation, the Agency rejected all the claims, finding that her failure-to-accommodate claim failed because she was not qualified to perform her position under her original medical restrictions without the elimination of essential functions.

She then filed this suit, alleging discrimination based on her disability and race and retaliation for taking protected actions in violation of the Rehabilitation Act, the Family Medical Leave Act, and Title VII of the Civil Rights Act. The parties conducted discovery, and USPS

moved for summary judgment. The district court granted summary judgment to USPS on all claims, and Cheatham appealed.

## II.

This court reviews a grant of summary judgment de novo. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020). Summary judgment is only appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Disability Discrimination Under the Rehabilitation Act

Cheatham makes two arguments in support of her claim of disability discrimination under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*: that USPS failed to accommodate her disability, and that in doing so USPS failed to engage in the required interactive process.[1] We examine those arguments in turn.

### 1. Failure to Accommodate

Cheatham argues that USPS failed to accommodate her disability by not providing her with work after her initial request in February 2016. After her medical restrictions changed in the fall of 2017, USPS offered her work that met her requirements, which she turned down in favor of disability retirement. Because she cannot identify an available position at USPS that she was qualified for before her medical restrictions changed, she cannot establish a prima facie case that USPS did not accommodate her.

---

[1] In briefing, in addition to making failure-to-accommodate and interactive process arguments, Cheatham raises an additional, generalized argument for disability discrimination. She does not meaningfully explain how this argument differs from her failure-to-accommodate argument, however, and we do not address it separately.

A plaintiff's prima facie case for failure to accommodate under the Rehabilitation Act may be established two ways, depending on the type of evidence presented by a plaintiff. *Fisher v. Nissan North America, Inc.*, 951 F.3d 409, 416-17 (6th Cir. 2020). If a plaintiff offers indirect or circumstantial evidence, the *McDonnell-Douglas* burden shifting framework applies. *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004). To establish her prima facie case, the plaintiff must show that she is 1) disabled, 2) that she is qualified for her position, 3) her employer was aware of her disability, 4) an accommodation was needed, and 5) her employer failed to provide the necessary accommodation. *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997). If a plaintiff offers direct evidence, no burden shifting is necessary. Instead, the plaintiff must show that she is 1) disabled, and 2) otherwise qualified for the position despite her disability a) without accommodation from her employer, b) with an alleged 'essential' requirement removed, or c) with a proposed reasonable accommodation. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). "The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Id.*

As an initial matter, Cheatham argues that the district court erred in not evaluating her claim under the direct evidence test. In the ADA context, this Court has determined that the direct test is always appropriate, because a failure to accommodate is listed in the ADA's definition of disability discrimination and therefore no inference is required to find discrimination occurred. *Fisher*, 951 F.3d at 416. The Court has not yet required the same for failure-to-accommodate claims under the Rehabilitation Act. *Id.* at 417.

We need not determine which test is appropriate in this case, however, because Cheatham has not met her burden under either standard. For both, Cheatham must establish that she was denied a reasonable accommodation. *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004). And because, after full discovery, Cheatham is unable to point to any available positions that she was qualified for at the time of her request, she cannot prove that she was denied a reasonable accommodation.

In a case like this where the plaintiff has requested transfer to a different position as a reasonable accommodation, the plaintiff must identify an available, funded position that she was qualified for that would have accommodated her medical requirements. *See Peltier*, 388 F.3d. at 989; *Willard v. Potter*, 264 F. App'x 485, 487-88 (6th Cir. 2008). The Rehabilitation Act does not require an employer to "create a position not then in existence." *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719, 729 (6th Cir. 2000). Without identifying an available position, Cheatham cannot prove that she was denied a reasonable accommodation, and therefore her claim fails.

Cheatham points to three positions that she alleges she was qualified for. However, she is unable to show that either they actually existed or were vacant at the time of her request, or that she was qualified for those positions. First, Cheatham points to the light duty position offered in November 2017. As an initial matter, this position did not meet her medical restrictions as USPS understood them before she submitted updated restrictions in October 2017. But more critically, Cheatham offers no evidence that this position was vacant at the time of her initial request.

Second, Cheatham argues that the July 21, 2017 email from Logan that said that "possible work has been identified in the Cincinnati Plant" provides definitive evidence that there was an available, suitable position. This email, from over a year after Cheatham's initial request for work, does not say that there was a vacant position, but merely that such a position might work with

Cheatham's medical restrictions. Indeed, given that the position is mentioned as part of Logan's ongoing search for qualifying work, it does not by itself establish that there was a vacant, funded position meeting Cheatham's qualifications.

Finally, Cheatham and the partial dissent suggest that she could have been placed back in her original clerk position at Corryville. But Cheatham offers no evidence to support the bare assertion that the clerk position at Corryville was vacant or available in February 2016. At the time of her February 2016 request, Cheatham had not worked at Corryville for four years. And USPS points to the July 2016 disability retirement certification that no work was available and the responses and deposition testimony from James Price stating specifically that there was no work available at Corryville that could have met Cheatham's medical requirements. Absent a showing from Cheatham that the Corryville clerk position was available, there is no need for us to examine whether she would have been qualified for the position under her original medical requirements.

Because Cheatham offered no evidence that there was an available position for which she was qualified, she has not established a prima facie case that USPS denied her accommodation. Summary judgment is appropriate.

### 2. Failure to Engage in the Interactive Process

Cheatham also argues that USPS did not engage with her in the required interactive process when she made her initial request to come back to work. Once an employee has requested an accommodation, her employer is required to engage with her in an interactive process to identify a suitable accommodation. *Fisher*, 951 F.3d at 421.

But examination of the interactive process is only required after the plaintiff has established a prima facie case that the employer has failed to accommodate her. In the ADA context, we have held that "failure to engage in the interactive process is only an independent violation . . . if the

plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014). We have applied the same principle to claims under the Rehabilitation Act. *See Willard*, 264 F. App'x at 488 ("[S]ummary judgment is warranted by the failure of the plaintiff after discovery to identify a vacant, funded position that the interactive process would have led to.") The Seventh Circuit has explained that the interactive process required by the Rehabilitation Act "is not an end in itself," so "an employer cannot be liable solely for refusing to take part in it." *Sansone v. Brennan*, 917 F.3d 975, 980 (7th Cir. 2019).

Because Cheatham is unable to establish a prima facie case for failure to accommodate, we need not determine whether USPS participated in the interactive process here in good faith. Summary judgment is warranted.

## B. Racial Discrimination Under Title VII

Cheatham also raises a claim for racial discrimination under Title VII of the Civil Rights Act of 1964. To establish a prima facie case for racial discrimination, a plaintiff must demonstrate that she is 1) a member of a protected class, 2) that she was qualified for her position, 3) that she experienced an adverse employment action, and 4) that a similarly situated person outside the protected class was treated more favorably than she was. *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013).

To establish the fourth element, Cheatham offered the example of Becky Schneider, a USPS employee who is white and disabled, as a comparator to establish the fourth factor in her prima facie case. Price also managed Schneider at Corryville. Although the record is not clear on Schneider's restrictions, they had to do with repetitive motion disorder and did not limit her to sedentary work. Her job, as modified for her disability, involved walking around.

The district court correctly found that Schneider was not similarly situated to Cheatham, causing her claim to fail. To be considered similarly situated, a comparator need not be identical but should be similarly situated "in all *relevant* respects." *Wright v. Murray Guard, Inc.* 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (italics original). Here, there are material differences between Cheatham and Schneider's disabilities and required accommodations. USPS contends that it was not able to find a job for Cheatham because her requirements demanded a completely sedentary position. When Cheatham's medical needs changed to resemble something closer to Schneider's, USPS was able to offer an accommodation. Schneider thus cannot serve as a comparator, and Cheatham is unable to establish a prima facie claim of race discrimination.

## C. Retaliation Claims

Lastly, Cheatham argues that the district court improperly granted summary judgment to the USPS on her retaliation claims under the Rehabilitation Act, Title VII and FMLA, 29 U.S.C. § 2601 *et seq*. Retaliation claims are also analyzed using the *McDonnell-Douglas* burden-shifting framework. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Under all three statutes, to establish a prima facie case of retaliation, Cheatham must show that 1) she engaged in a protected activity, 2) USPS knew that she exercised that right, 3) Cheatham then suffered an adverse employment action, and 4) there was a causal connection between the exercise of her right and USPS's adverse employment action. *See Strickland v. City of Detroit*, 995 F.3d 495, 510 (6th Cir. 2021) (Title VII); *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 381 (6th Cir. 2017) (FMLA); *Gribcheck*, 245 F.3d at 550 (Rehabilitation Act).

Cheatham cites three protected activities: requesting FMLA leave in 2015, requesting accommodation under the Rehabilitation Act, and bringing her 2017 Equal Employment Opportunity complaint. She also identifies three supposed adverse employment actions: Cheatham's leave-without-pay status, her "lack of pay," and the delay in accommodation. Cheatham offers no explanation for how her lack of pay differs from the delay in accommodation. She also does not identify which adverse employment actions were in retaliation for which protected activities, but generally argues that temporal proximity explains causation. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (causation may be satisfied via evidence that "the adverse action was taken shortly after the plaintiff's exercise of protected rights").

Her claims fail. As an initial matter, her Title VII claim fails because all the alleged adverse actions occurred before Cheatham filed her Equal Employment Opportunity complaint in 2017. Assuming she has made a prima facie case on her other two claims, she fails to rebut USPS's nonretaliatory explanations for its actions. She offers no evidence that she was on leave-without-pay status for any reason other than the USPS's standard procedures when an employee fails to get surgery for a workplace injury approved prior to seeking leave. To the extent that any coding was done in error, it was corrected before her retirement. And as discussed above, she is unable to demonstrate that delays in accommodation were not caused by the lack of available positions meeting her requirements.

III.

For the reasons set forth above, we AFFIRM the district court's grant of summary judgment in favor of USPS on all claims.

WHITE, Circuit Judge, concurring in part and dissenting in part. I join parts II.B and II.C of the majority opinion. However, I dissent from the affirmance of the dismissal of Cheatham's disability-discrimination claim. A genuine dispute remains regarding (1) whether Cheatham could have performed the essential functions of a window clerk, with an accommodation, from February 2016 to October 2017; and (2) whether USPS failed to engage in the interactive process in good faith during this time.

## I.

To establish a disability-discrimination claim, the plaintiff must show that she is disabled and otherwise qualifies for the position. *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir. 1988). An individual is otherwise qualified if she can perform the essential functions of the job with or without a reasonable accommodation and without endangering her health and safety or that of others. *Id.* If the individual seeks a reasonable accommodation to maintain her current position, an employer may be required to modify how the position is customarily performed to enable the individual to perform the position's essential functions. *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014); *see also Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010) (noting that cases construing the Americans with Disabilities Act are instructive in construing the Rehabilitation Act). A suggested accommodation is not reasonable if it requires eliminating an essential function of the job. *Rorrer*, 743 F.3d at 1039. The employer bears the burden of proving that a challenged job criterion is essential. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).

## A.

Cheatham was officially assigned to USPS's Corryville Branch (Corryville), where her last-held position was as a window clerk. Although she had not physically worked at Corryville

since 2012 because of ongoing medical issues, her continuing to be on the rolls there prevented the Corryville manager, James Price, from filling her position.

When asked if she was physically able to return to work in 2016 and 2017, Cheatham testified that she was, adding that she was able to do light housework and drive for short amounts of time. However, because of her disability, she was unable to perform activities such as exercising, running, taking long walks, or grocery shopping without a motorized cart. For the same reason, from February 2016 to October 2017, she was medically restricted to sit-down duty only, no standing; lifting less than ten pounds, only while seated; pulling as much as needed but, again, only while seated; and the least amount of walking possible, and only with a protective boot.[1] Cheatham testified that she called Price in January 2016 so that he could "prepare a place or do what he needed to do as a supervisor" at Corryville to allow her to work within these medical restrictions, starting February 15, 2016. R. 26-2 PID 211.

In sum, during the relevant time, Cheatham was limited to performing sedentary work, with very minimal walking in a protective boot, and lifting ten pounds or less while seated. According to Cheatham, she could have performed the essential functions of the window-clerk position within these limitations. According to USPS, based on the same restrictions, Cheatham could not have performed the essential functions of a window clerk.

---

[1] Beginning in October 2017, Cheatham was no longer limited to sit-down duty, lifting no more than ten pounds while seated, or very minimal walking in a protective boot. As a result, USPS offered her a modified, distribution-clerk position in November 2017. However, these facts are unimportant when deciding if a genuine dispute remains regarding whether Cheatham could have performed the essential functions of her assigned position as a window clerk under the more stringent medical restrictions in effect from February 2016 to October 2017, and whether USPS failed to accommodate her with respect to this specific and distinct position during this time. Additionally, given the significant differences between the two sets of medical restrictions and two positions, Cheatham's assertion that the November 2017 accommodation demonstrates that USPS could have made the same accommodation before October 2017 is unpersuasive.

**B.**

The majority contends that it need not reach the question whether Cheatham could have performed the essential functions of a window clerk because no evidence supports the assertion that such a position was available at Corryville. I do not agree. Price stated that because Cheatham was still on the rolls at Corryville, "she was filling a number, a job" there, which could not be filled until she was assigned elsewhere. R. 29 PID 879. Price does not explain what he meant by "a job," but given that Cheatham was still assigned to Corryville in February 2016 and all inferences are to be drawn in Cheatham's favor, there is sufficient evidence supporting that the spot she was "filling" was her last-held position there as a window clerk. Price's statement that he "[didn't] have sedentary work" does not demonstrate otherwise. R. 29 PID 879. It merely shows that Price believed that no position at Corryville could be performed while sedentary (a belief not supported by the record, as discussed next); it says nothing about whether a window-clerk position was available there. Nor does Cheatham's disability-retirement paperwork undermine this conclusion. It simply states that "[r]eassignment is not possible," meaning that Cheatham could not be placed in a position other than her assigned position, which, again, was last as a window clerk at Corryville. R. 31-16 PID 1084. In short, the evidence adequately supports Cheatham's assertion that a window-clerk position was available at Corryville, which leaves the question whether she could have performed it while sedentary.

Cheatham testified that a window clerk sells stamps, weighs packages, delivers mail over the counter to customers, postmarks mail received from customers, processes passports, sells money orders, and "[m]aybe" empties or swings a mailbox to get letters and puts them on the distribution truck. R. 26-2 PID 205. Similarly, according to Price, as listed on the job description provided by USPS, a window clerk: "[s]ells" postage stamps, stamped paper, postal cards, and

migratory bird stamps; "[a]ccepts from and makes" window delivery to customers of parcel post, insured, c.o.d., and registered mail and general delivery mail; "makes collection of" postage and fees; "issues" receipts; "[i]ssues and cashes" foreign and domestic money orders; "[r]ents" post office boxes; "receives" rental payments; "conducts" reference checks; "completes" required forms; and "[p]rovides" information to the public concerning postal regulations, mailing restrictions, rates, and other matters involving postal transactions. R. 31-1 PID 959. The job description also states that one "must be physically able to perform efficiently the duties of the position." R. 31-1 PID 962.

Based on this evidence—which is regrettably light but is all that the parties produced with respect to the essential functions of a window clerk—a reasonable jury could find that Cheatham could have performed the essential functions of the position while seated with very minimal walking in a protective boot and without lifting more than ten pounds, especially given that all reasonable inferences are construed in her favor. None of the verbs associated with the duties listed above suggest that they need to be performed while standing or with more than minimal walking in a protective boot or that they involve lifting more than ten pounds. A single conclusory statement from Price—"We don't have sedentary work" at Corryville—is not enough to show otherwise.[2] *Cf. Hall*, 857 F.2d at 1079 ("[W]hile [a postal service supervisor] asserts that distribution clerks must lift heavy sacks of mail, he does not state that all distribution clerks must

---

[2] Another statement made by Price—"I have nothing for Ms. Cheatham, she has not reported here in years. I last sent disability papers up for her 2 months ago"—does not refer to sedentary work. R. 26-5 PID 446. The email involves a request for paperwork to submit to a physician to obtain workers' compensation and Price's response that he has nothing to submit. USPS also points to Cheatham's disability-retirement paperwork, maintaining that it demonstrates that she could not perform the essential functions of a window clerk under her medical restrictions. However, the form has a box to check if "the medical evidence presented to the agency shows that accommodation is not possible due to severity of medical condition and the physical requirements of the position." R. 31-16 PID 1083. This box is unchecked and, thus, the form does not resolve the question. Additionally, it is worth noting that Cheatham applied for disability retirement only after five months had passed since she first requested to return to work and she had not been offered a position. Her desire was not to retire but to work two or three years more.

do so on a regular basis, nor does he say that clerks could not do the job if they could lift only 25–30 pounds, as [the plaintiff] can.").

Regarding related duties that would likely exceed Cheatham's medical restrictions—e.g., accepting or delivering packages through the window that weigh more than ten pounds, or "maybe" swinging a mailbox or putting letters on a distribution truck—USPS presents no evidence to demonstrate that excusing Cheatham from such duties strips away an essential function of the window-clerk position and is therefore unreasonable. *See Kleiber*, 485 F.3d at 869. Additionally, the job description does not list a certain lifting requirement, so a jury could find that lifting more than ten pounds is conditional, as it could with respect to "maybe" swinging a mailbox or putting letters on a distribution truck; this means that such duties are not necessarily essential. *See Rorrer*, 743 F.3d at 1043; *see also id.* at 1044 ("Shifting marginal duties to other employees who can easily perform them is a reasonable accommodation."). In short, USPS fails to meet its burden to demonstrate that any challenged job criterion—standing or lifting more than ten pounds—is essential.

The district court, over the span of a single page, rejected Cheatham's failure-to-accommodate claim without conducting any meaningful inquiry into the essential functions of the window-clerk position or asking whether Cheatham could have performed them under the medical restrictions in effect from February 2016 to October 2017.[3] Yet, "[i]n determining whether a

---

[3] The district court based its decision on the fact USPS eventually offered Cheatham a reassignment accommodation in November 2017 and she rejected it. The majority does not address this, deciding the matter on other grounds—that Cheatham was not qualified for any available position. I note, however, that the district court erred in not recognizing, as Cheatham argued, that an unreasonable delay in providing an accommodation may constitute a discriminatory act. *See, e.g.*, *McCray v. Wilkie*, 966 F.3d 616, 622 (7th Cir. 2020) ("[W]e cannot rule out the possibility that the factfinder might conclude the 11-month delay in accommodating McCray's disability was unreasonable."); *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) ("There are certainly circumstances in which a long-delayed accommodation could be considered unreasonable and hence actionable[.]" (internal quotation marks omitted)); *Farquhar v. McCarthy*, 814 F. App'x 786, 788 (4th Cir. 2020) ("[A]n unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate . . . that

handicapped individual can perform the essential functions of a position and, if not, whether a reasonable accommodation will enable him or her to do so, a district court will need to conduct an *individualized inquiry* and make appropriate findings of fact." *Hall*, 857 F.2d at 1078–79. Moreover, the individualized determination of whether physical qualifications, such as standing or lifting packages weighing certain amounts, are essential functions of a job "requires the court to engage in a highly *fact-specific* inquiry." *Id.* at 1079; *see also Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013) ("Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment."). The appropriate inquiry would have revealed what the above paragraphs set out: Cheatham met her burden to demonstrate that she could have performed the essential functions of a window clerk while working within the limits of the medical restrictions in effect from February 2016 to October 2017, and USPS did not meet its burden to show that standing or lifting more than ten pounds was essential to the position. Thus, a genuine dispute remains regarding whether Cheatham otherwise qualified as a window clerk and the district court's decision as to her disability-discrimination claim should be reversed on this ground.[4]

## II.

"Once an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2020). The purpose

violates the Rehabilitation Act."); *see also Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262–63 (10th Cir. 2001) (discussing relevant factors). Moreover, the district court neglected to address whether Cheatham otherwise qualified as a window clerk as early as February 2016, which is a question unrelated to whether she could have been reassigned to a non-window-clerk position once her medical restrictions eased in October 2017. *See supra* note 1.

[4] Cheatham also argues that USPS failed to accommodate her by not reassigning her to a non-window-clerk position prior to November 2017. However, she fails to present evidence of a vacant position to which she could have been transferred during this time and, thus, summary judgment was appropriate in this regard. *See Kleiber*, 485 F.3d at 869–70.

of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations," which requires "communication and good-faith exploration of possible accommodations." *Kleiber*, 485 F.3d at 871; *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 840 (6th Cir. 2018) (stating that the interactive process is "mandatory" and requires a "meaningful dialogue with the employee to find the best means of accommodating the disability"). If the interactive process was triggered but never initiated or resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Fisher*, 951 F.3d at 421 (quoting *Kleiber*, 485 F.3d at 871).

Failing to engage in good faith may include "causing unnecessary delays or obstructing the process, as well as failing to adequately communicate or provide information during the process." *Brumley*, 909 F.3d at 840. For example, an employer acts in bad faith when it determines what accommodation it is willing to offer without first speaking to the employee, *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018), or never even considers accommodating an employee because it has already concluded, on its own, that the employee is unfit for the position, *Rorrer*, 743 F.3d at 1045. On the other hand, "[a]n employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff." *Jakubowski*, 627 F.3d at 203. "[S]ummary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), v*acated on other grounds sub nom. US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

**A.**

As a preliminary matter, it is necessary to delineate two separate processes by which USPS attempts to find work for employees who are either injured on the job or are disabled.[5] For the former, USPS does so by means of a "rehabilitation assignment":

> [a]n assignment into which the Postal Service places an injured employee when the employee's doctor notifies the Postal Service that the employee has reached maximum medical improvement and the employee still has medical restrictions that prohibit the employee from returning to his or her date of injury job. A rehabilitation assignment may or may not include essential functions of the employee's date of injury job.

R. 34-1 PID 1253. For the latter, USPS does so by means of a reasonable accommodation, which involves

> [m]odification or adjustments to the . . . work environment . . . to allow individuals protected by the Rehabilitation Act to . . . perform the essential functions of a position [and] enjoy benefits and privileges of employment equal to similarly situated employees without disabilities[.]

R. 34-1 PID 1252. These are separate rights: the Federal Employees' Compensation Act (FECA) provides the right for employees injured on the job to seek a rehabilitation assignment; the Rehabilitation Act provides the right for disabled employees to be reasonably accommodated.

USPS also employs a unique set of procedures for processing reasonable-accommodation requests, which are detailed in USPS Handbook EL-307 (EL-307). The reasonable-accommodation process is activated when an employee uses "plain language" to let "[h]is or her supervisor or manager, or any Postal Service supervisor or manager," or the Reasonable Accommodation Committee within the employee's district (DRAC), "know that he or she requires a change at work because of a physical or mental impairment." R. 34-1 PID 1236. Requests must

---

[5] Both parties, as well as the district court, had a tendency to conflate the two. However, in her briefs, below and on appeal, Cheatham argued that USPS failed to follow its reasonable-accommodation-specific procedures, as listed in the EL-307 handbook.

be documented for local record keeping to ensure "a timely decision," and a copy must be provided to the requesting individual. R. 34-1 PID 1191. Requests "must be processed promptly." R. 34-1 PID 1190.

An informal dialogue should then be conducted with the requesting individual to determine with exactitude the accommodation requested and the essential functions of the position. This is a six-step "interactive process":

- *Step One:* Determine whether an individual has a disability and meets minimum qualification standards.

- *Step Two:* Determine the essential functions of the job.

- *Step Three:* Identify the abilities and limitations of the individual.

- *Step Four:* Identify potential accommodations.

- *Step Five:* Determine the reasonableness of the accommodations and whether implementation would impose an undue hardship.

- *Step Six:* Select and implement an accommodation from identified reasonable alternatives that can be implemented without an undue hardship.

R. 34-1 PID 1192. "Gaining the individual's participation is a key part of the process—that's what makes it interactive"—which requires consulting with the employee "to determine what he or she needs to enable him or her to perform the job." R. 34-1 PID 1195–96.

If the person processing the request—say, a supervisor or manager—has questions concerning the reasonableness of the requested accommodation, believes that the accommodation may not allow the individual to perform the essential function of the job, or needs help finding a way to accommodate the individual, then the request must be referred to the DRAC.[6] Similarly, if

---

[6] EL-307 also provides that reassignment as a form of reasonable accommodation "may be required if . . . [n]o other accommodation will allow the employee to perform the essential functions of the position[.]" R 34-1 PID 1239. In such a case, human-resources personnel should be consulted as well as the area law office.

the person processing the request ultimately decides to deny an individual's request for accommodation, then the request must be referred to the DRAC, which will then review the request and refer the matter to the legal department for an opinion. If the legal department agrees with the decision to deny the request, the individual must be notified in writing as soon as possible.

Cheatham argues that USPS failed to follow any of the above reasonable-accommodation procedures. USPS argues that it engaged in the interactive process in good faith, pointing in support to actions taken by Cliff Logan, Manager of Health and Resource Management (HRM) for Cheatham's district, and Evon Clark, Cheatham's HRM specialist.

**B.**

The record establishes questions of fact. As discussed, Cheatham testified that she called Price in January 2016, so that he could "prepare a place or do what he needed to do as a supervisor" at Corryville to allow her to work within her medical restrictions, starting on February 15, 2016. R. 26-2 PID 211. This plain-language request for a change at work because of a physical impairment is all that is required to activate USPS's reasonable-accommodation process. Yet, nothing in the record demonstrates that Price documented Cheatham's reasonable-accommodation request, provided a copy of it to Cheatham, and then promptly engaged in a six-step interactive process with her. As Cheatham testified: "I was never contacted by anybody." R. 26-2 PID 244. Such failures to communicate with and provide information to an employee after the interactive process has been triggered is evidence of bad faith. *Brumley*, 909 F.3d at 840.

Further, the only evidence of a possible "interaction" is Cheatham's testimony that Price told her union steward that he was not going to bring her back because of her restrictions. Assuming Price had concluded that Cheatham could not perform the essential functions of a window clerk, two material facts arise. First, per EL-307, he was required to refer Cheatham's

request to the DRAC, but the record does not indicate that he did. And, second, he would have determined, on his own and without first discussing the matter with Cheatham, that she was unfit for her window-clerk position and that he was not going to try to accommodate her. Both can be seen as evidence of bad faith. *See Rorrer*, 743 F.3d at 1045.

USPS's argument that that Logan and Clark engaged in the mandated interactive process is not supported by the record. Their job was to "try to find work" for "employees that were injured" on the job—that is, to look for a rehabilitation reassignment.[7] R. 26-7 PID 470. And a rehabilitative search was, indeed, undertaken on Cheatham's behalf. But this demonstrates only that Logan and Clark worked to put her back to work as an injured worker under the FECA, which involves a different set of obligations and procedures unrelated to identifying whether an employee can perform the essential functions of her assigned position with a reasonable accommodation.[8] There is no evidence demonstrating that Logan and Clark engaged in the interactive process mandated by the Rehabilitation Act and provided for in EL-307.[9] Nor is there evidence that they documented Cheatham's accommodation request or had an informal dialogue with her to determine the essential functions of a window clerk, her physical abilities and limitations as they

---

[7] Additionally, the record indicates that Cheatham was in contact with Logan and Clark regarding workers' compensation.

[8] Logan and Clark focused on identifying a position that was already suited for Cheatham given her medical restrictions. They did not address whether she could have performed her assigned job (or another position) with a reasonable accommodation.

[9] A search for a rehabilitative assignment for an employee injured on the job is markedly different. There is no mandate to have a meaningful dialogue with the employee. Instead, a priority-for-assignment worksheet is sent to the branch or office where the employee is assigned to see if there is suitable work there given her medical restrictions. If the branch/office manager determines that the employee cannot be placed there, then the Rehabilitation Program Committee widens the search and contacts other managers within a fifty-mile commuting area to see if reassignment is possible elsewhere. If nothing is found within the fifty-mile commuting area, then there is some overlap with the reasonable-accommodation process, as the employee's case is then referred to the DRAC to widen the search beyond the local commuting area. However, this referral is done in service of furthering a rehabilitative search—it does not take the place of the reasonable-accommodation process set out in EL-307. In fact, a separate handbook, EL-505, guides the rehabilitation-assignment process.

relate to these essential functions, or whether possible accommodations would enable her to perform them. And, again, failures to communicate and provide information after a reasonable-accommodation request has been made is evidence of bad faith. *Brumley*, 909 F.3d at 840. The majority concludes that even if there was a failure to engage in the interactive process in good faith, there can be no claim because there was no job within her limitations. But this assumes that she could not perform her job as a window clerk without a reasonable accommodation—which is an open question.

To be sure, once Cheatham made another reasonable-accommodation request directly to the DRAC in August 2017, more than a year and half after her first request, an interactive process occurred. But, as Logan and Robyn Funderberg, former Chair of the DRAC, acknowledged, the process is not designed to take this long—it should have happened sooner. And evidence of an unreasonable delay is also evidence of bad faith. *Id.*

In sum, a reasonable jury could find that USPS failed to engage in the interactive process in good faith. Thus, granting summary judgment in this regard was inappropriate.

\* \* \*

For the foregoing reasons, I respectfully dissent.